### VAN BEUREN et al. v. WOTHERSPOON et al.

(Supreme Court, Appellate Division, First Department. December 11, 1896.)

1. LEASE—RENEWAL—RENTAL VALUE—ARBITRATION.

A lease provided that, if the parties thereto could not agree on the rent for a renewal term, each should choose an arbitrator, and that the arbitrators should determine the value of the lot, and allow 5 per cent. as the rental value; but that, if they could not agree, they should select an umpire, "whose decision under oath shall fix and determine the same." It

also provided that, if a renewal was refused by the lessor, he should pay to the lessee the value of a building standing on the lot, which value shall be "ascertained by three disinterested persons, to be chosen as aforesaid." *Held,* that if the arbitrators failed to agree on a valuation, either as to the lot or as to the building, and selected an umpire, the latter should act alone, without the presence or aid of the arbitrators.

2. SAME—FAILURE TO SELECT UMPIRE—ACTION TO FIX VALUE.

An action to fix the rental value for a renewal term may be maintained by the lessor, though the lease provided that it should be fixed by arbitrators selected by the parties, or, if they disagreed, by an umpire to be chosen by the arbitrators, where the lessee's arbitrator, after a disagreement, went abroad without joining in the selection of an umpire, and his attorney, though often requested by plaintiff, who offered to accept any one satisfactory to defendant's arbitrator, to choose an umpire, failed to do so for nearly a year after the original term had expired.

3. SAME—DEFENSE—OFFER TO ARBITRATE.

An action to fix the rental value of a renewal term brought by the lessor after failure of the lessee's arbitrator, for nearly a year after the expiration of the term, to join with the plaintiff's arbitrator in selecting an umpire, as provided in the lease, cannot be defeated by an offer, made at the trial, to proceed with the arbitration.

Appeal from special term, New York county.

Action by Elizabeth S. Van Beuren and others against Frances A. Wotherspoon and others. From a judgment dismissing the complaint on the merits, and for costs, plaintiffs appeal. Reversed.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, PATTERSON, and INGRAHAM, JJ.

William Mitchell, for appellants.

Nelson S. Spencer, for respondents.

WILLIAMS, J. The action was brought to procure the valuation of certain lots, and of the buildings thereon, in the city of New York. The facts, so far as we need to refer to them here, are as follows: March 2, 1874, Mary S. Van Beuren and Caroline Hoppock entered into a written agreement under seal, wherein Mrs. Van Beuren, party of the first part, leased to Mrs. Hoppock, party of the second part, the lot in question, for 21 years from March 1, 1874, at the yearly rent of $1,000, payable half-yearly on the 1st days of March and September. The agreement contained the following provisions, among others:

"At the expiration of the term here granted, the party of the first part, her heirs or assigns, shall have the full liberty and choice, either to grant a renewal of this lease for the further term of twenty-one years thence ensuing, at such annual rent, payable half-yearly (but not less than the rent of the last preceding term), as shall be agreed upon by the said parties, their heirs, executors, administrators, or assigns, respectively * * *. And, in the event of their not agreeing upon such rent, each party shall choose a disinterested person to ascertain the same, which persons so chosen shall themselves, respectively, be owners in fee simple of one or more lots of land in the neighborhood of the one here demised, and shall, in making their award or determination in the said premises, under oath, appraise and value the said lot of land hereby demised, at its full and fair worth or price at private sale, considering the same as an unincumbered vacant lot, and five per cent. on the amount of their said appraisement or valuation shall be the annual rent of the said lot of land for such further term; and in case the arbitrators should differ in the amount of their appraisement or valuation, as aforesaid, they shall then choose an umpire, qualified as aforesaid, whose decision under oath shall fix and determine the same, * * *

or to pay unto the said party of the second part, her executors, administrators, or assigns, the value of the front building now thereon, or its substitute, of similar character, if then standing, which value shall be ascertained by three disinterested persons, to be chosen as aforesaid. * * * It is expressly understood that the party of the first part, her heirs or assigns, shall not be required to make her or their election, in any case provided by this lease, until both the valuations herein provided shall have been made, unless the valuation be prevented by the fault of the lessor, her heirs or assigns, or her or their arbitrators."

Caroline Hoppock went into possession and occupied the lot, under this agreement, until her death, November 23, 1890. She left a will under which her interest in the lot and buildings and the agreement in question vested in the defendants, either directly or by other wills or conveyances. Mary S. Van Beuren died August 9, 1894, and her interest in the lot and buildings and agreement vested in the plaintiffs. Before the term of the lease or agreement expired, and as a result of negotiation between the parties, there was a failure to agree upon the value of the lot or buildings, and in February, 1895, each party selected an arbitrator under the agreement, the plaintiffs selecting Mr. Jackson, and the defendants Mr. Whitridge. March 4, 1895, two days after the expiration of the term, the arbitrators proceeded to act, and made efforts to agree with each other, and finally, and in July, 1895, it was determined that they could not agree. The plaintiffs' arbitrator appraised the lot at $100,000, and the building at $15,000. The defendants' arbitrator appraised the lot at $80,000, and the building at $40,000. Thereupon the plaintiffs' arbitrator, under date of July 24, 1895, wrote the defendants' arbitrator, sending a list of names of persons proposed by him, from which to select the umpire, and a blank appointment, asking him to select one of the names, insert it in the blank, sign, and return for the signature of plaintiffs' arbitrator that day, so the appointment could be made before he left for Upper Saranac Lake, to be gone several weeks. No answer was made to this letter until the next year, June, 1896. Early in August, 1895, defendants' arbitrator met with an accident, and became seriously ill, and unable to attend to any business. In October, 1895, as soon as he was able to be about, he went abroad, and did not return until the middle of May, 1896. In the meantime, and September 25, 1895, plaintiffs' attorneys wrote to defendants' attorneys, calling attention to the fact that the letter of July 24, 1895, by plaintiffs' to defendants' arbitrator, had not been answered, and notifying him this was a delay in the proceedings on the part of defendants' arbitrator, and asking if he meant to refuse to proceed in the arbitration. To this letter defendants' attorney replied September 27, 1895, informing plaintiffs' attorney of the accident to, and sickness of, defendants' arbitrator, and saying that he did not refuse to proceed, but was most anxious to go on with the arbitration, and would inquire as to the condition of defendants' arbitrator, and ascertain how soon it would be possible to proceed. October 2, 1895, the plaintiffs' attorneys, by letter, asked defendants' attorney to submit names for an umpire. October 3, 1895, defendants' attorney wrote plaintiffs' attorney that the agreement permitted the

arbitrators to appoint the umpire irrespective of the wishes of the parties, and he could not speak for the defendants' arbitrator; that, so far as his clients were concerned, any one of four persons whose names he mentioned would be agreeable; that he did not, by sending the names, intend to make any formal submission of names that would bind defendants' arbitrator, and, as the proceeding could not go on in the absence of the arbitrator, it was useless to submit any names then.    To this letter plaintiffs' attorney replied, agreeing to accept one of the gentlemen whose names were submitted by defendants' attorney, Mr. Wickersham, as umpire, on condition that defendants would proceed at once, before him alone, without either arbitrator, to determine the value of the lot and buildings; that plaintiffs' arbitrator informed them, two days before, that defendants' arbitrator had gone to Europe on account of his ill health, and that their clients would not consent that the arbitration should stand over until defendants' arbitrator was able to proceed, but would consent that the papers appointing Mr. Wickersham umpire be signed by defendants or their attorney, with the same force and effect as if signed by defendants' arbitrator himself.    On the same day defendants' attorney wrote plaintiffs' attorney that neither he nor his clients felt authorized or willing, in the absence of their arbitrator, to agree in his behalf upon an umpire, and certainly were unwilling to proceed before the umpire in the absence of their arbitrator; that, as he (the attorney) understood the law, the presence of each arbitrator was necessary to the validity of the proceeding, the agreement providing that the value of the building "shall be ascertained by three disinterested persons, to be chosen as aforesaid"; that he regretted the delay, but neither party could be prejudiced, as his clients were entitled to the possession of the premises as tenants from year to year.    October 31, 1895, plaintiffs' attorney replied to the letter of defendants' attorney of October 17, 1895, saying that as defendants' arbitrator was abroad for his health, and intended to remain for an indefinite time, they requested defendants' attorney to appoint another arbitrator in his place, to the end that an umpire might be appointed, and the arbitration brought to a conclusion, and urging, if they refused to do this, defendants' attorney would say what he proposed to do; that they wanted this matter concluded, so they could exercise their option of renewnig the lease or paying for the building; and that they could not agree that delay was not prejudicial, or that his clients were entitled to the possession of the premises as tenants from year to year.    November 6, 1895, defendants' attorney answered the letter of plaintiffs' attorney of October 31, 1895, saying that he thought defendants' arbitrator would be back in a month or two, and they were entitled to his judgment and experience.    Upon subsequent inquiry, December 11, 1895, by plaintiffs' attorneys, defendants' attorney informed them that defendants' arbitrator's return was not fixed upon, but it would probably be about February 1, 1896.    After waiting until January 17, 1896, and nothing further being done or proposed by defendants, and their arbitrator still remaining abroad, the plaintiffs brought this action.    The trial did not take place until June 19, 1896, and

the court then decided that the action could not be maintained, and dismissed the complaint. The trial court based its decision upon the ground that, "failing mutual agreement, each party to the lease was entitled to strenuous and diligent efforts, not to say eager and conscientious co-operation, towards a valuation of the lot by two disinterested persons, with an eventual umpire, and similarly towards a valuation of the building by the three disinterested persons; and, without making and manifesting such an effort, neither could resort to the court for either valuation, and this the plaintiffs had neither done nor shown."

It seems to us this conclusion must have resulted from an incorrect interpretation of the agreement itself. The court evidently assumed that the valuation of the building was to be ascertained only by the joint appraisal of the three persons, as arbitrators, instead of by the two as arbitrators if they agreed, and, if they failed to agree, then by the umpire selected by them, such umpire acting alone in determining such value. In this we think there was error. It is very clear that the value of the lot was to be determined by the two arbitrators alone, if they could agree, and, if they failed to agree as to the value, they were to appoint an umpire; and, this being done, the duty of the arbitrators ended, and the matter of value rested in the determination of the umpire alone. Lyon v. Blossom, 4 Duer, 318–325, and cases therein cited; Brown v. Lyddy, 11 Hun, 451; Wood, Arb. & Awards (Ed. 1872) 841.

It is equally clear to us that precisely the same power and duty was imposed upon the three persons, and each of them, as to the value of the building. The language of the agreement was, "which value shall be ascertained by three disinterested persons, to be chosen as aforesaid." Under this language, two of the persons would be chosen by the parties themselves, and the third could only be chosen by the two already selected by the parties, and only in the event that the first two themselves disagreed. There can be no possible reason for saying that, when the two persons should be chosen by the parties themselves, these two should not be regarded as arbitrators, and when the third was chosen, after a disagreement between the two arbitrators, he should not be regarded as an umpire. The two provisions should be read together, and the latter should be construed in view of the clear meaning of the former. Nothing in the language indicates an intention to require a different rule of action by the three persons in the case of the valuation of the building than that of the lot. The three persons were evidently expected to act as to the buildings as they would act as to the lot; and in this action the valuation of the building was to be ascertained by them in the same manner as the value of the lot. This was a common-law arbitration, and not one under the Code of Civil Procedure; and the only reasonable construction to be given to the agreement, it seems to us, is the one we have suggested. It was not provided that the three persons should all be arbitrators, and they could not well be such. If chosen as provided in the case of the lot, two must be arbitrators, and one an umpire. And, if such was to be their designation, the only reasonable conclusion is that

they were to act in the same manner as the three persons were to act with reference to the lot. Agreements in precisely similar terms have been the subject of construction by the general term of the supreme court, First department. Brown v. Lyddy, 11 Hun, 451; Lorenzo v. Deery, 26 Hun, 447. In the first case the opinion was written by Mr. Justice Brady, and was concurred in by Presiding Justice Davis; and in the other case the opinion was written by Mr. Justice Daniels, and was concurred in by Presiding Justice Davis. In the first case the same construction was given to the agreement that we have given here. In the other case an entirely opposite construction was given to the agreement. In the first case the form of the submission to the arbitrators does not appear, and we are led by the report of the case to infer it was by parol, as it is here. In the last case the submission was in writing, signed by the parties, though not acknowledged, proved, or certified, and the arbitration was not, therefore, governed by the provisions of the Code of Civil Procedure (section 2365 et seq.), and was in no way affected by those provisions (section 3386). The submission, however, expressly provided that "the three persons to be selected should, with the two chosen by the parties, ascertain the value of the building as provided in the lease." The parties, therefore, by their submission made the third party an arbitrator, and not an umpire, and thereby gave a practical construction to the language of their agreement, which the court was justified, if not bound, to follow in that particular case. In the absence of such formal submission, we may assume the presiding justice would not have concurred in that decision, which would then have been in direct conflict with the former decision of the same court. Having these two decisions in mind, we must adhere to the conclusion already expressed, as to the construction of the agreement in this case.

This construction being given to the agreement, there can be no question as to the right of the plaintiffs to maintain this action. When the arbitrators failed to agree as to the value of the lot and building in July, 1895, the only duty left for them to perform was to choose an umpire. It was entirely unnecessary for them to be present, or to act with the umpire in the performance of his duties under the agreement. The defendants' arbitrator practically refused to act in the performance of his duty to agree with the plaintiffs' arbitrator in selecting a person as umpire. He should have acted at once, when it became a settled fact that the arbitrators could not agree, and that was July 24, 1895. He was called upon to act at that time by the plaintiffs' arbitrator, who submitted to him a list of names. It is said that he did consider these names, and prepared an answer to be sent to plaintiffs' arbitrator, and was still considering the matter when he met with a severe accident, and that a serious illness resulted, which rendered it impossible for him to transact any business. This was the early part of August, 1895. He remained in New York until October, 1895, and then was able to be about, and went abroad for his health. Before he went abroad, however, and in September, 1895, the plaintiffs' counsel called the attention of defendants' counsel to the failure of defendants' arbitrator

to act in the matter of choosing the umpire, and all through the month of October, 1895, the plaintiffs' counsel was urging upon defendants' counsel the selection of an umpire, so that the proceedings might be brought to a conclusion.    There is nothing in the case to show that defendants' arbitrator might not, before he went abroad, or after he went, have agreed with plaintiffs' arbitrator upon the person to be selected as umpire, and have signed the paper appointing him.    Any person satisfactory to defendants should have been satisfactory to him.    The plaintiffs' and defendants' counsel did agree upon a person satisfactory to all of them,—Mr. Wickersham. We see no reason why the defendants should not have asked their arbitrator to unite in his appointment, or why the arbitrator, upon being requested by the defendants, should not have signed a paper making such appointment.    The defendants refused to do anything to bring this about.    The plaintiffs were willing to have the defendants themselves sign the appointment, and to agree that it should have the same force and effect as though signed by their arbitrator himself.    The defendants refused to do anything except to wait until the arbitrator should come home, and be able to be present at the further hearing of the matter.    The plaintiffs asked defendants to appoint another arbitrator, but defendants would not do that. Plaintiffs used their very best efforts during October and November, 1895, and waited through December, 1895, and until the middle of January, 1896, and then, unable to secure an appraisal of the lot and building in any other way, commenced this action.    There was not only a neglect, and practically a refusal, by defendants' arbitrator to act as his duty required him to do in the selection of an umpire, but evidently such neglect and refusal to act were in harmony with the wishes and advice of the defendants.    Certainly, the arbitrator would have acted in appointing Mr. Wickersham if the defendants had desired or requested it.    Under these circumstances, the plaintiffs were clearly justified in applying to the court for relief in the premises, and were entitled to maintain this action.

It has frequently been held that where a party refuses to appoint an arbitrator, or the arbitrator refuses to act, the court, in the exercise of its equitable jurisdiction, will itself afford relief to the injured party by ascertaining and fixing the value of the property itself (Viany v. Ferran, 5 Abb. Prac. [N. S.] 110; Kelso v. Kelly, 1 Daly, 419; Graham v. James, 7 Rob. [N. Y.] 468; Dunnell v. Keteltas, 16 Abb. Prac. 205); and that a court of equity will, by an appropriate remedy, secure to either party to a lease the benefit of a clause providing for an arbitration as to the value of the property, though they cannot decree specific performance of an agreement to arbitrate (Johnson v. Conger, 14 Abb. Prac. 195; Smith v. Rector, etc., 107 N. Y. 610, 14 N. E. 825).    Within the well-settled rules laid down in these cases, and in view of the action of the defendants with reference to this arbitration, the court was called upon to afford the plaintiffs relief in this action, and should have done so.    It did permit the parties on both sides to give evidence as to the value of the lot and building, but finally refused to fix and determine such value.    In this, we think, the court erred.    Having acted as they did, the de-

fendants were not entitled, at the time of the trial, to have the matter of values remitted to the arbitrators merely because the defendants' arbitrator had finally returned, and was willing to proceed with the arbitration.   They should not have been permitted to delay the matter for nearly a year, and until the trial of plaintiffs' action was brought on, and then defeat the action by offering to proceed, and do what it was their duty to do nearly a year before, and before the plaintiffs had been put to the trouble and expense of bringing and trying their action.

For the reasons herein suggested, the judgment should be reversed, and a judgment entered appointing a suitable person to appraise and value the lot and building, etc., as prayed in the complaint, with costs of the action and of the appeal.   All concur.