HYDRAULIC POWER COMPANY OF NIAGARA FALLS, Plaintiff, *v.* PETTIBONE CATARACT PAPER COMPANY, Defendant.

HYDRAULIC POWER COMPANY OF NIAGARA FALLS, Plaintiff, *v.* CATARACT CITY MILLING COMPANY, Defendant.

(Supreme Court, Niagara Special Term, July, 1920.)

Injunctions — actions to restrain defendants from interfering with the construction of a tunnel for the purpose of carrying off and utilizing certain waste waters — contracts — easements — equity.

The fairness of a contract is to be judged as of the time it was made. (Pp. 539, 540.)

Where a grant or right in the nature of an easement has once been exercised and located, the location and definite course so fixed cannot be changed without the acquiescence and consent of both parties. (P. 541.)

The plaintiff is the owner of a hydraulic system designed to develop hydraulic and electric power, and consists of a canal tapping the Niagara river some distance above the Falls. The water received from the river is conducted through the canal to a basin on the high bank of the river below the falls, and is dropped over the bank onto turbines which generate power. Defendants' plants are erected on land the title to which is bounded by the edge of the high bank of the river about 215 feet above the surface of the water in the river. Between the edge of the high bank and the margin of the river is a strip of land of varying width, which is owned by plaintiff. The turbines of the defendants are located about 100 feet below the top of the high bank, and after the water has been dropped from the high bank onto the turbines it is discharged upon and flows over the plaintiff's land and into the river. For many years prior to 1900 the discharged water after leaving defendants' wheel pits flowed down and over the talus or slope of land owned by plaintiff. *Held,* that though the defendants would have had no legal right to divert the waters to other parts or to have insisted on the right to have constructed either a tunnel or canal across

the lands of the plaintiff, the contracts made in that year between the parties put an end to any such claim. (P. 541.)

A contract made in 1900 by each of the defendants with plaintiff's predecessor, whereby the parties settled and adjusted their disputes, determined anew the quantity of water each was to take and the manner and method of ascertaining the quantity, the price to be paid, etc., and provided that the party of the first part would afford to the party of the second part " every proper facility for the construction, maintenance and operation of such tunnel * * * and * * * does hereby grant unto said party of the second part the right to enter on, construct, maintain and operate in, through and across said party's premises * * * such tunnel, flume, conduit and cross tunnels and appurtenances as may be necessary or proper," etc. *Held,* that said agreement was an executed rather than an executory contract; that there was a present grant which conferred a right or easement in and through the property of the defendants rather than to give one in the future, and that the agreement was one which equity would enforce. (Pp. 543, 544.)

Where, therefore, each of the defendants in a written communication to plaintiff raising objections to its proposed plans for the construction of the tunnel, repudiated the agreement *in toto* so far as related to the tunnel, at the same time claiming for themselves all the other rights and privileges given by the agreement, the plaintiff in an action to restrain the defendants from interfering with the construction of the tunnel under the properties of the defendants for the purpose of carrying off and utilizing certain waste waters after the same had been used by the defendants for the generating of power for their respective plants, as provided by the contract of 1900, will be granted judgment for the relief demanded.

The good fortune of the plaintiff in benefiting by the advance in the value of such rights was no reason why the defendants should not abide by the agreements as made.

Actions for injunctions.

Edward E. Franchot, for plaintiffs.

Louis Marshall and William W. Storrs, for defendants.

34

WHEELER, J. These actions involve substantially the same facts in each case, and have, therefore, been tried together. The decision in one involves the decision of the other.

These actions were brought to restrain the defendants from interfering with the construction of a tunnel under the properties of the defendants for the purpose of carrying off and utilizing certain waste waters after the same had been used by the defendants for generating power for their respective plants, as provided in certain contracts with the defendants made January 1, 1900. The contract made with each defendant is practically identical so far as they relate to the tunnel in question.

The plaintiff is the owner of a hydraulic power system designed to develop hydraulic and electric power. It consists of a canal tapping the Niagara river a distance above the falls of that name. The water received from the river is conducted through the canal to a basin on the high bank of the river below the falls, and from this basin dropped over the bank onto turbines below, which generate power. The water taken by each of the defendants drops upon wheels which by suitable shafting are mechanically connected with their machinery in their factory or mills above. Most of the other water taken from said basin is conducted to turbines built at the edge of the river, and there converted into electrical power which is transmitted by wires and cables to the factories and plants using the power. The plants of the defendants are erected on land the title to which is bounded by the edge of the high bank of the river about 215 feet above the surface of the water in the river. Between the edge of the high bank and the margin of the river is a strip of land of somewhat varying width, which is owned by the plaintiff. The turbines or water wheels of the defendants

are located about 100 feet below the top of the high bank.   After the water has been dropped' from the high bank onto these wheels it is discharged upon and flows over the plaintiff's land until it flows into the river itself.

Prior to the making of the contracts of January, 1900, the defendants had each been taking and using certain quantities of water for power purposes from the plaintiff's predecessor in title.   Controversies had arisen as to the quantity of water the parties were entitled to draw from the hydraulic basin, and the duties each owed the other under their then existing agreements.   Suits had been brought and were pending against defendants growing out of alleged violations of such agreements.

That being the situation, the defendants each entered into an agreement with the Niagara Falls Hydraulic Power and Manufacturing Company (the predecessor of the plaintiff), whereby the parties settled and adjusted their disputes, determined anew the quantity of water each was to take, and the manner and method of ascertaining the quantity, the price to be paid, etc. These agreements further recited that whereas, " it is contemplated by the said party of the second part [*i. e.,* the power company] that it will sometime in the future construct a tunnel, flume or other conduit along or within the easterly bank of Niagara River for the purpose of collecting water discharged by the mills operating on the top of said bank, and otherwise flowing over said bank, and of accumulating such water and. making use of the same, in the development of power on the lower portion of said bank " therefore " said party of the first part does hereby grant unto said party of the second part, the right to enter on and construct, maintain, and operate in, through and across its said first party's premises, located on the

easterly bank of Niagara River, in the City of Niagara Falls, N. Y., where the mills of said Cataract City Milling Company and of the Pettibone Cataract Paper Company are now located, such tunnel, flume, conduit and cross tunnels and appurtenances as may be necessary or proper for the collection, accumulation and conveyance of the water discharged from the wheels in said mills of the Pettibone Cataract Paper Company, and of other mills on said bank, and from any other wheels which may hereafter be located or operated on said bank, and of any other water passing over said bank, and for conveying the same to such point where it can be conveniently used by said second party." The agreement then goes on to specify how the work .shall be done and sets forth many things which it is not necessary to set forth beyond what is subsequently given in the course of this opinion.

The Niagara Falls Hydraulic Power and Manufacturing Company subsequently became merged into the plaintiff in this action, which acquired thereby all the rights, property and franchises of its predecessor.

In 1914 the present plaintiff determined to proceed with the construction of the tunnel and flume, and took steps toward that end, and submitted for the consideration of each defendant a plan of the proposed tunnel. Thereupon each defendant repudiated the right of the plaintiff to construct such tunnel, and refused to permit the plaintiff to proceed with its construction. As will more fully appear later on, the defendants and each of them declined to co-operate with the plaintiff or take any steps in relation thereto. The plaintiff thereupon, after having taken certain steps provided for in the agreements referred to, brought these actions for an injunction to restrain the defendants from in any manner interfering with or preventing

the construction of the tunnel as provided in said agreements.

Many objections have been raised by defendants against the relief asked. It will be impossible to discuss them all. We can only refer to the more important.

The defendants contend at the outset that the plaintiff cannot maintain these actions as the successor by merger of the Niagara Falls Hydraulic Power and Manufacturing Company with the Hydraulic Power Company of Niagara Falls. This contention is based on the decision of the Court of Appeals in *Irvine* v. *New York Edison Co.,* 207 N. Y. 425, where it was held that when one corporation is acquired by and merged into another corporation under section 15 of the Stock Corporation Law, and the latter has not contracted to pay the debts of the former, a creditor of the merged corporation cannot maintain against the possessor corporation an action to collect a debt due to him from the merged corporation, since there is no provision in such statute making the possessor corporation liable for the debts of the merged corporation.

Under the provisions of section 15 of the Stock Corporation Law the successor corporation, upon a merger pursuant to the provision of the statute, " shall acquire and become, and be possessed of all the estate, property, rights, privileges and franchises of such other corporation, and they shall vest in and be held and enjoyed by it as fully and entirely and without change or diminution as the same were before held and enjoyed by such other corporation, and be managed and controlled by the board of directors of such possessor corporation, and in its name, but without prejudice to any liabilities of such other corporation or the rights of any creditors thereof."

It is argued that the plaintiff, the possessor corporation, never assumed any of the liabilities of the contracts with the defendants of 1900, and, therefore, cannot seek an enforcement of any of the provisions thereof. By resolution of the executive committee of the board of directors of the plaintiff, ratified by the subsequent resolution of the board itself, the obligations of the merging companies were assumed by the plaintiff.

We think it may be fairly claimed that the plaintiff by such resolutions has assumed all the obligations in the defendants' favor. If, however, the resolutions referred to are ineffective for that purpose, we think the very steps taken by the plaintiff looking toward the construction of the tunnel referred to in the contracts, and the bringing of these actions to enjoin the defendants from interfering with its construction, constitute a full and complete assumption of any and all obligations imposed by said agreements on the plaintiff or its predecessors in title.

The contracts and the rights therein conferred became the property of the possessor corporation, the plaintiff in this action. Going with such rights and privileges are the corresponding obligations to be performed and kept in favor of the defendants. The rights and privileges and obligations imposed are inseparable, and when the plaintiff accepted and undertook to avail itself of the franchises, easements and privileges conferred it necessarily and by very operation of law, also assumed the counter obligations imposed. It could not enjoy the privileges without meeting the obligations.

This case is quite different from the case of *Irvine* v. *New York Edison Co.*, 207 N. Y. 425. There the action was not by the possessor corporation, but against it by a creditor of one of the merged corpora-

tions. Had the defendants in these cases become plaintiffs against the plaintiff here, then the contention made possible might have been available. Such is not the case here presented.

Attention should also be called to the provisions of the contracts themselves. The final provisions of these agreements are:

" It is hereby mutually understood and agreed that this agreement shall bind and inure to the benefit of the parties named and also to their respective successors and assigns.

" In case of the sale by said party of the second part of all its property and franchises to a corporation which shall assume its liabilities, and it shall thereupon be deemed advisable to dissolve said party of the second part, it is further agreed by said first party that in such case it will consent to the substitution of said purchasing corporation in place of said party of said second part, and will look to it, said purchasing corporation, for the fulfillment of all the obligations it shall assume."

The acquisition by merger of the property and rights of a constituent corporation may not be technically a " sale." Nevertheless it would seem to be within the purview of the agreement of the parties, and to present substantially the same situation as though there had been an out and out sale for cash to a purchaser.

In any event, these provisions clearly indicate a purpose and intent that whatever person or corporation should acquire the property and rights of a party to the agreement, should become substituted to the rights and obligations of such company.

For these reasons we are of the opinion that the position of the defendants that the plaintiff may not

enforce the rights given under the contract now under consideration, is not well taken.

It is urged by counsel for the defendants that the contracts in question should not be enforced on account of *laches* on the part of the plaintiff and its predecessor in title. It is true the contracts were made in 1900, and it was not decided until 1914 to proceed with the construction of the tunnel contemplated in the agreements. There is no claim that the project was ever formally abandoned by the plaintiff or its predecessor in title. The mere lapse of time cannot be deemed sufficient to defeat a right or easement clearly granted and conferred. It is manifest from the wording of the instruments in question that it was not contemplated the work of constructing a tunnel should be begun at an early date.

The agreements read: "And whereas, it is contemplated by said party of the second part, that it will *sometime in the future,* construct a tunnel  *  *  *  for the purpose of collecting the water, etc."

The instruments leave the time for constructing the tunnel purposely indefinite. Evidently it was expected that its construction should not be undertaken until the demand for power should be such as to justify the utilization of the waste waters for that purpose. The evidence is that the public demand for power created no occasion for the tunnel until about the time it was determined to proceed with the work.

We clearly are of the opinion that the plaintiff lost none of its rights under these contracts because of any delay in not building at an earlier date. We do not mean to say that delay may not operate in special cases to defeat a right conferred, where by the lapse of time the situation of the parties or properties have so changed as to make it inequitable to enforce such a right. I am unable, however, to discover in the evi-

dence in this case that any such changes exist, or any altered physical conditions which would make the construction of the tunnel more hazardous or burdensome to the defendants than it was at the time the contracts were made. Indeed it was practically conceded by the engineer called and sworn for the defendants, that if the work of building the tunnel is carefully and properly done, the danger to the defendants' properties would not be at all serious. Certainly no more serious than it was had the tunnel been built shortly after the agreements were made.

We think that the defense of *laches* is without merit. In nearly all cases where the defense of *laches* is available, it will, we think, be found that some element of estoppel existed which made it inequitable to enforce strict legal rights. In this connection and somewhat akin to the defense of *laches* is the general argument advanced by the defendants that other conditions have so changed that the plaintiff ought not to prevail in these actions.

It is said water power has become more valuable since the making of the contracts, and it would be unconscionable in view of such facts to now enforce the agreement for a tunnel. If the enforcement of the contracts deprived the defendants of any rights, if it lessened the amount of power they are to get, if it interfered with the enjoyment of what it is stipulated they should receive, there might be color to the argument advanced. The building of the tunnel, however, works none of these things. The defendants are deprived of no power belonging to them or agreed to be furnished. The defendants have only the use of the water as it flows for the purpose of generating power, and to a limited quantity. After it has passed their wheels and accomplished its purpose for them it is no longer the property of the defendants, but

waste water flowing over and across the plaintiffs' lands to the river below. The contracts simply provide for a means of utilizing these waste waters, by permitting a tunnel to be run through and under the defendants' properties.

We are unable to see how the defendants are deprived of anything, or that the advance in the value of power or power rights in any way affects the questions now under consideration. The good fortune of the plaintiff in benefiting by the advance in the value of such rights is no reason why the defendants should not abide by the agreements made.

Among other objections raised by the defendants to the relief asked is that if granted and the agreement made is carried out by the construction of the tunnel for the carrying off of the waste water after it has been used on the defendants' wheels, it will operate to deprive the defendants of a right claimed to sink their power shafts to substantially the level of the river, whereby greatly increased power can be developed by the additional fall, and that to deprive defendants of such additional power would be most inequitable and so unjust that a court of equity ought not in good conscience to enforce such provisions in the plaintiffs' favor.

The first answer to the defendants' contention is that by the agreements of January 1, 1900, said defendants each agreed that they " will not permit the discharge of water on its premises at any other points that were now discharged, unless the same be necessary to the proper conducting of its business, and in no event shall it locate its wheels or discharge any water on or over said bank at a lower level than 461.5 feet above mean low tide at Albany, and that in any event it will before making such new discharge at or above said point 461.5 feet above tide level, give

to the party of the second part six months previous notice of its intention so to do, and will afford said party of the second part all proper and reasonable facilities for building proper connections to collect and convey said water from such new point of discharge to such points as second party may desire.''

In other words, the defendants agreed not to substantially change the location of their wheel pits lower than their present location below the top of the bank, which negatives by positive agreement any pretended right on their parts to sink their wheel pits to the substantial level of the river for the purpose of generating increased power by an additional fall of the water.

These terms and conditions of the contract between the parties were not deemed unreasonable or oppressive at the time they were made. The contracts in question were not hastily or inadvisedly made. It appears they were the subject of prolonged preliminary negotiations between the parties, in which the defendants were represented and advised by able and distinguished legal counsel. We are unable to discover anything in the evidence that made or makes the contracts entered into unfair or inequitable. It certainly was thought fair at the time it was made, and the principle is clearly laid down that in passing upon the question of fairness a contract is to be judged as of the time it was entered into. *Prospect Park & Coney Island R. R. Co.* v. *Coney Island & Brooklyn R. R. Co.,* 144 N. Y. 152–162; *Franklin Telegraph Co.* v. *Harrison,* 145 U. S. 459; *Pacific State Savings, L. & B. Co.* v. *Green,* 123 Fed. Repr. 43–46; *Marble Co.* v. *Ripley,* 10 Wall. (77 U. S.) 339–356; *Lee* v. *Kirby,* 104 Mass. 420, 428.

As was said by the court in the case of *Prospect Park & Coney Island Railroad Co.,* at page 162: '' The rule established by the above and kindred cases is

that the contract is to be judged as of the time at which it was entered into, and if fair when made the fact that it has become a hard one by the force of subsequent circumstances or changing events will not necessarily prevent its specific performance.''

Sugden on Vendors (chap. 5, § 3, ¶ 25) says: ''A Court of Equity does not affect to weigh the actual value, nor to insist upon an equivalent in contracts, when each party has equal competence. When undue advantage is taken, it will not enforce the contract; but it cannot listen to one party saying that another man would give him more money or better terms than he agreed to take. It may be an improvident contract but improvidence or inadequacy do not determine a court of equity against decreeing specific performance.''

In any event conditions have not so changed since the contracts were made as to make their enforcement more burdensome at the present time than when made. The entire argument of counsel for the defendants is based on the assumption and assertion that prior to the making of the contracts in question, they each had the right to take a given quantity of water for power purposes and the right to utilize that quantity to the greatest advantage by sinking wheel pits below the point 461.5 feet above mean low tide at Albany, at which point the wheel pits were then located.

As matter of law and as matter of fact it is exceedingly questionable whether under the prior contracts existing before the contracts of January 1, 1900, were made, said defendants had any right to lower their wheel pits for the purposes of additional power. The practical situation existing at that time and existing now was and is that the point 461.5 was the point at which the vertical cliff ended, and talus or slope at the foot thereof began. This talus or slope meas-

ures approximately 150 feet horizontal distance from cliff to water's edge. To install machinery at a point below 461.5 necessarily involved some means to discharge the waters used, and this could only be done by providing some tailrace from the turbines or wheels, which involved a tunnel under, or a canal across, the plaintiff's lands, whereas it in fact flowed over and down the surface of the slope into the river. Could the defendants under their former rights claim the right to construct and maintain across plaintiffs' lands any such tunnel or canal, in absence of any specific agreement therefor?

The authorities seem to hold that where a grant or right in the nature of an easement has been once exercised and located, the location and definite course so fixed cannot be changed without the acquiescence and consent of both parties. *Evangelical Lutheran St. John's Orphan Home* v. *Buffalo Hydraulic Assn.,* 64 N. Y. 561; *Onthank* v. *Lake Shore & M. S. R. R. Co.,* 71 id. 196; *Stephens* v. *New York, O. & W. R. Co.,* 175 id. 83; *Burlew* v. *Hunter,* 41 App. Div. 151; *Hines* v. *Hamburger,* 14 id. 577.

For many years prior to the contracts of January, 1900, the discharged waters after leaving the defendants' wheel pits flowed down and over the talus or slope of land owned by the plaintiff, and under the authorities cited, we are of the opinion the defendants would have had no legal right to divert the waters to other parts, or to have insisted on the right to have constructed either a tunnel or canal across the lands of the plaintiff. In any event, the contracts of January 1, 1900, put an end to all such claims.

In these actions the defendants have endeavored to relieve themselves from the obligations and duties imposed by the agreements of January 1, 1900, in so far as such agreements confer rights on the plaintiff

to construct the tunnel and flume referred to in these contracts. It is only fair to observe that for fifteen years the parties to those agreements operated under them without objections to any of the terms and conditions thereof, and it was not until the plaintiff took steps toward availing itself of the rights conferred that the defendants repudiated the obligations imposed on them. This repudiation, however, does not go to a repudiation of the entire contracts, but only to that portion thereof relating to the construction of the tunnel. The defendants, in other words, seek to retain for themselves all the benefits secured by the agreements in question with repudiation of one of the essential provisions for the benefit of the plaintiff. They desire to retain the benefits without, on the other hand, recognizing the burden. This attitude on the defendants' part does not appeal to the equitable consideration of the court. In any event, the recognition by the defendants for some fifteen years of the contract by availing themselves and enjoying the benefits of the agreements made in 1900, must be deemed strong, if not a controlling circumstance in the disposition of these cases.

It is urged by the defendants that these actions are in the nature of ones for specific performance, as well as one for injunctive relief, and in so far as it partakes of the nature of specific performance, it cannot be maintained. The sum and substance of the defendants' argument is that the agreements between the parties leave to the future an agreement between them as to the location and specifications of the tunnel to be constructed, and that specific performance cannot be maintained to compel the meeting of the minds of parties to such an agreement.

We think the actions here brought cannot be deemed, in any sense, ones for specific performance, but rather ones for simply injunctive relief.

The prayers of the complaints demand judgment enjoining and restraining the defendants " from interfering in any manner with the construction, maintenance or operation of a conduit, tunnel, flume and appurtenances in, upon, and along said described premises of the defendant * * * in pursuance of the terms of the contract between the defendant and the Niagara Falls Hydraulic Power & Manufacturing Company, under date of January 1st, 1900."

It is true there is also added the further prayer " that the performance of the said contract in favor of the plaintiff and the grant therein to plaintiff as successor of said Niagara Falls Hydraulic Power & Manufacturing Company herein, be specifically decreed and enforced."

The mere prayer for relief is of little consequence. The actual relief necessary to protect and maintain the rights and equities of the parties must be the determining factor.

Studying the contracts in question, we are impressed with the fact that nothing remains to be done by the defendants under them saving to permit the plaintiff to proceed with the construction of the tunnel in accordance with the grant contained in the contract with each. We construe each of these instruments as actually conferring an easement for the construction of a tunnel under and across its property; a present easement rather than an agreement to give one in the future. We think it an executed, rather than an executory contract.

The language of the agreement is " that it will afford to said party of the second part every proper facility for the construction, maintenance and operation of such tunnel, flume or other conduit, and for collecting, accumulating and conveying through and by means of the same, and for making proper, efficient

use of such tunnel, conduit and water, and said party of the first part *does hereby grant unto said party of the second part* the right to enter on, construct, maintain and operate in, through, and across its said party's premises located on the easterly bank of Niagara River in the City of Niagara Falls, N. Y. * * * such tunnel, flume, conduit and cross tunnels and appurtenances as may be necessary or proper," etc.

The language is the language of a present grant, and conferred a right or easement in and through the property of the defendant. The grant having been made, it is a matter of little consequence in these cases whether in the absence of definite location of the tunnel, under the common law, the plaintiff or the defendant would have the right to designate its particular location, for the agreements themselves point out the method as to how that shall be done. It is sufficient to say that the agreements establish an easement which courts of equity have and will recognize and enforce for the purpose of protecting the rights and equities of the parties. *Wyncoop* v. *Berger,* 12 Johns. 222; *Winchester* v. *Osborne,* 61 N. Y. 555; *Onthank* v. *Lake Shore & M. S. R. R. Co.,* 71 id. 194; *Barber* v. *Nye,* 65 id. 211; *Moorhead* v. *Snyder,* 31 Penn. St. 514; *Peabody* v. *Chandler,* 42 App. Div. 384; *Palmer* v. *Palmer,* 150 N. Y. 139, 147.

Counsel for the defendants, however, contends that this action in substance seeks to compel the defendants to agree on the location and specifications of the tunnel contemplated, and to compel the selection of an arbiter of differences between them, and to that extent is in the nature of an action to enforce the specific performance of the agreement in those particulars, and that the exercise of such powers is beyond the power or authority of a Court of Equity. He cites in sup-

port of his contention the case of *Pavila* v. *United Trust Co.* (N. J. Court of Appeals), 103 Atl. Rep. 519, and the other cases cited in the opinion in that case. In that case the general doctrine is enunciated that a contract for the purchase of land, the price of which is to be ascertained by arbitration, cannot be specifically enforced in whole or in part. The case seems to have been decided on the theory that the specific performance of a contract will not be decreed in equity unless the contract be actually concluded and be certain in all its parts.

Whether the doctrine there laid down will be followed by the courts of this state in its entirety, may be an open question. However that may be, the case cited is very distinguishable from those now in hand for disposition.

These actions are not in their essential features for a specific performance. They do not seek to compel the defendants to do anything toward the fulfillment of the agreements, save to restrain them from interfering with work in constructing the tunnel and its connections, all to be done by the plaintiff and not by the defendants. The actions do not seek to compel the defendants to agree to any plan or plans for the tunnel. They do not ask for the appointment of any engineer to confer with the engineer of the plaintiff, nor do they demand the naming of an arbiter for the parties. The actions on the other hand proceed upon the assumption that all the essential things required to be done for the adoption of plans and specifications have already been done, and the plans approved by the chief engineer of the Holyoke Water Power Company have become and are the duly authorized plans for the tunnel in question. If this be so, then there is nothing indefinite and uncertain about the matter, and nothing which would interfere with a

·35

decree of specific performance, if such a decree were required. The inquiry then is, are the plans proposed and approved by the engineer of the Holyoke Water Power Company to be deemed the plans duly adopted for the tunnel to be constructed?

We must, therefore, examine and analyze the agreement of the parties and what was done and omitted to be done by them.

The agreements in substance provide that the tunnel shall be constructed at least seventy-five feet below the surface of the lands on top. That before beginning work the plaintiff shall submit to each defendant its plans for the proposed work, showing the proposed location thereof. This was done. They then provide that within thirty days the property owners should make known to the plaintiff any objections thereto, or any proposed modifications thereto. Each defendant, after the receipt of the first plans proposed, wrote the plaintiff raising objections to the plans submitted. In the same communication each defendant gave notice that it disputed and denied the right of the plaintiff to act in any manner under said agreement of January 1, 1900, stating, among other things, " That we do not recognize said agreement of January, 1900, as of any force and effect, in so far as the same relates to any tunnel construction or the appropriation of our water rights or the use of our premises for any construction for the purposes of the development of power through the use upon our premises of the additional fall below the present discharge of water from our wheel pits." It declares the agreement relating thereto " invalid from the inception."

In other words each defendant repudiated the agreements *in toto,* so far as the construction of the tunnel is concerned, at the same time apparently claiming for themselves all the other rights and privileges given

by the agreements. Whether such an inconsistent attitude can be successfully maintained it is not now necessary to discuss.

The agreements further provide if objections are made to the plans submitted the engineers of the parties to the agreement " shall thereupon confer in reference to said plans and the objections and proposed modifications thereto and endeavor to reach some agreement concerning the same."

The plaintiff, after the receipt of the defendant's objections to its proposed plans in writing, asked each defendant to designate its engineer to confer with plaintiff's engineer, as provided in the contract and at the same time submitted supplemental plans to meet certain objections raised. Each of the defendants then wrote, making objections to the amended or supplemental plans, and reiterated each and every statement contained in its former letter of objections. The defendants each neglected and refused to appoint an engineer for conference as agreed.

Thereupon the plaintiff wrote each defendant, calling attention to the fact that it had failed to appoint an engineer, and proposing to submit the objections and matters in difference to its own engineer and to A. F. Sickman, the chief hydraulic engineer of the Holyoke Water Company, and notifying each defendant that such differences would be brought to hearing before such engineers at a time and place named.

Referring again to the agreements under consideration, it was provided that if after a conference between the engineers of the parties they were unable to agree concerning said plans, they should select a third competent and disinterested engineer to act with them, and the determination of said engineers or any two of them concerning the same should be conclusive on the parties. It was further expressly agreed that in case the

engineers of the parties should fail to agree upon the third engineer, then the chief engineer of the Holyoke Water Power Company should be the third engineer to act in any matter then the subject of difference between the engineers of the parties hereto.

The defendants having failed to appoint an engineer for conference, the plaintiff served the notice above stated that the differences would be submitted to their own engineer and the chief engineer of the Holyoke Water Power Company. Thereupon each defendant addressed a communication to the plaintiff and to its engineer and to Mr. Sickman, the engineer of the Holyoke company, giving notice said contract was invalid and not binding on it and that the same had been terminated, and the plaintiff had no rights thereunder, and that said matters could not be submitted to them and any action by them would be illegal and void, and in short, repudiating all obligations and duties thereunder.

Nevertheless said engineers did examine the objections and matters in dispute, and the plans and specifications submitted were by them finally approved with some slight modifications thereof.

Upon these plans so approved, the plaintiff proposes to construct the tunnel in question, and asks injunctive relief against any interference with their execution by the defendants.

It seems to us that the plaintiff has done all that it was called on to do in the premises. It has pursued the method pointed out by the agreements of the parties for the final and conclusive adoption of plans. The defendants have been given all the opportunity called for by the contracts to procure modifications thereof, that they have omitted to avail themselves of the opportunities given, and the plans approved and adopted by the plaintiff's engineer and the engineer

of the Holyoke Company must be deemed the plans in force for the construction of the tunnel in question. There is nothing indefinite and uncertain about them, and there exists no good and sufficient reason why this court should not enjoin and restrain the defendants from interfering with the construction of the tunnel in accordance therewith.

If there was any failure to be represented on the hearing before the engineers, it was the defendants' fault and not that of the plaintiff. They had full and ample notice and opportunity to be present. Their refusal to designate an engineer to act for them, or to confer with the engineer of the plaintiff was for all purposes a failure to agree upon a third engineer within the meaning of the contract, and in that event, the contract expressly provided who should act as the third engineer. It would be inequitable to hold that a party to a contract may defeat the very purposes and objects of such contract, by simply refusing to act under it. Neither law nor equity tolerate such evasions. Even the doctrine contended for by the learned counsel for the defendants is not without its limitations. As was said by Judge Miller, in his opinion in *Mutual Life Ins. Co.* v. *Stephens,* 214 N. Y. 495: " There have been numerous cases in which the courts have decreed specific performance of agreements in leases to renew at a rental value to be fixed by appraisers chosen by the parties, or to convey the premises at its value to be fixed in like manner. But in such cases the provision for an appraisal has been regarded as incidental and subsidiary to the substantive part of the agreement; and so the party refusing to name an appraiser has not been heard to complain of not having the appraisal made in the way agreed upon; but, treating the method as a matter of form rather than substance, the courts have by a reference or otherwise determined the value

for the purpose of enforcing the contract according to its real spirit and purpose. (See *Kelso* v. *Kelly,* 1 Daly, 419; *Van Beuren* v. *Wotherspoon,* 12 App. Div. 421; *Weir* v. *Barker,* 104 id. 112; *Grosvenor* v. *Flint,* 20 R. I. 21; *Kaufmann* v. *Liggett,* 209 Penn. St. 87; *Castle Creek Water Co.* v. *City of Aspen,* 146 Fed. Repr. 8). In such cases the appraisal has been made as a mere incident to the main relief granted, *i. e.,* the enforcement of the agreement to sell or renew.''

We think even though these cases are to be deemed suits for specific performance, nevertheless the provision of the agreements that the engineers of the respective parties shall confer as to details on tunnel plans is but incidental and subsidiary to the substantive part of the agreement.

The right to construct the tunnel has been given, the location specified in the agreement, only minor details of construction were left open for further consideration. Certainly the party refusing to name its engineer to confer over these details ought not to be heard to complain if the engineer of the plaintiff and the engineer of the Holyoke Water Power Company finally determine the details, acting as we have already shown in the manner directed by the agreements.

The failure to appoint an engineer to confer with plaintiff's engineer over plans is but tantamount to a failure to agree on plans, in which event the Holyoke Water Power Company's engineer was to act as arbiter, and this he has done.

Reviewing the whole case, we are unable to discover good or sufficient reasons for denying the plaintiff the rights conferred by the contracts in question, and, therefore, direct judgments in the plaintiff's favor for the relief demanded in the complaint with costs of the actions.

Judgments accordingly.