FEDERAL POWER COMMISSION *v.* NIAGARA
MOHAWK POWER CORP.

No. 28.   Argued October 15–16, 1953.—Decided March 15, 1954.

240

*Willard W. Gatchell* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Stern, Assistant Attorney General Burger, Murray L. Schwartz, Paul A. Sweeney, Hubert H. Margolies, Herman Marcuse* and *Joseph B. Hobbs.*

*John W. Davis* argued the cause for respondent. With him on the brief were *Randall J. LeBoeuf, Jr., Lauman Martin, Taggart Whipple* and *Chauncey P. Williams, Jr.*

*Nathaniel L. Goldstein,* Attorney General, filed a brief for the State of New York, as *amicus curiae,* setting forth the views of the State of New York upon questions of title to water rights in the Niagara River.

MR. JUSTICE BURTON delivered the opinion of the Court.

The most significant issue raised by this case is whether the Federal Water Power Act of 1920 [1] has abolished pri-

---

[1] The Federal Water Power Act of 1920, 41 Stat. 1063, as amended, is now Part I of the Federal Power Act, 49 Stat. 838, 16 U. S. C. §§ 791a–825r.

vate proprietary rights, existing under state law, to use waters of a navigable stream for power purposes. We agree with the Court of Appeals that it has not. We agree also that in computing a federal licensee's amortization reserve, required by § 10 (d) of that Act, as amended,[2] the Federal Power Commission was not justified in disallowing the expenses paid or incurred by the licensee in this case for the use of such rights.

March 2, 1921, Niagara Falls Power Company, a New York corporation, predecessor in interest of Niagara Mohawk Power Corporation, a New York corporation, respondent herein, secured from the Federal Power Commission the federal license with which we are concerned. It was the first such license issued under the Federal Water Power Act of 1920. Its term was 50 years. It authorized the diversion of water for power purposes from the Niagara River, above the Falls, and the return of it below the Falls, all in New York. The daily diversion, in the aggregate, could not exceed 19,500 cubic feet per second (c. f. s.).[3]

---

[2] "SEC. 10. All licenses issued under this Part shall be on the following conditions:

. . . . .

"(d) That after the first twenty years of operation, out of surplus earned thereafter, if any, accumulated in excess of a specified reasonable rate of return upon the net investment of a licensee in any project or projects under license, the licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until the termination of the license or be applied from time to time in reduction of the net investment. Such specified rate of return and the proportion of such surplus earnings to be paid into and held in such reserves shall be set forth in the license. . . ." 49 Stat. 842, 843, 16 U. S. C. § 803 (d).

[3] This limit soon was increased to 19,725 c. f. s., 6 F. P. C. 184, 185, and later to 20,000 c. f. s., see 9 F. P. C. 228, 244, n. 28. The Treaty between the United States and Great Britain relating to boundary waters between the United States and Canada, proclaimed May 13,

Section 10 (d) of the Act requires each licensee, after 20 years of operation under such a license, to establish and maintain amortization reserves out of any surplus thereafter earned and accumulated in excess of a reasonable return upon the licensee's net investment. Section 14 makes such net investment, plus severance damages, a principal measure of the price the Government is to pay when and if it takes over all or part of the property.[4]

1910, limited the diversion from the United States side to 20,000 and from the Canadian side to 36,000 c. f. s. 36 Stat. 2448, 2450. As to additional emergency and temporary diversions, see 55 Stat. 1276, 1380; 1 U. S. Treaties and Other International Agreements 694.

[4] 49 Stat. 844–845, 16 U. S. C. § 807. See also, § 16 as to compensation to be paid for temporary use of the property by the Government, 41 Stat. 1072, 16 U. S. C. § 809; § 20 as to rate fixing, 41 Stat. 1073–1074, 16 U. S. C. § 813; and § 26 as to a purchase by the Government at a judicial sale, 41 Stat. 1076, 16 U. S. C. § 820. "Net investment" is defined in § 3 as follows:

"(13) 'net investment' in a project means the actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission,' plus similar costs of additions thereto and betterments thereof, minus the sum of the following items properly allocated thereto, if and to the extent that such items have been accumulated during the period of the license from earnings in excess of a fair return on such investment: (a) Unappropriated surplus, (b) aggregate credit balances of current depreciation accounts, and (c) aggregate appropriations of surplus or income held in amortization, sinking fund, or similar reserves, or expended for additions or betterments or used for the purposes for which such reserves were created. . . ." 49 Stat. 839, 16 U. S. C. § 796 (13).

In the instant case the Commission explains that—

"Section 10 (d) is part of a larger pattern of fairness set up by the act to induce water-power development. Licensees are assured a 'fair return,' but the public is safeguarded against profiteering by a licensee through profits beyond a fair return. At the end of the license period and upon 'recapture' by the Federal Government, earnings throughout the license period are to be tested against a fair return standard set up in section 3 (13)." 9 F. P. C., at 248.

In 1942, the Commission expressly held that § 14 applied to this licensee.[5]

In 1947, Article 11 of the license was amended so as to specify a 6% rate of return and to require 50% of the licensee's surplus earnings to be paid into its amortization reserves. As so amended, the article read:

> "After the first twenty (20) years of operation of the project under this license, namely after March 1, 1941, six (6) per cent per annum shall be the specified rate of return on the net investment in the project for determining surplus earnings in accordance with the provisions of Section 10 (d) of the Act for the establishment and maintenance of amortization reserves to be held until termination of the license, or in the discretion of the Commission, to be applied from time to time in reduction of the net investment in the project, and one-half of all surplus earnings in excess of six (6) per cent per annum received in any calendar year shall be paid into and held in such amortization reserves."[6]

---

[5] This resulted from the decision that the "fair value" provisions of § 23 (a), 49 Stat. 846, 16 U. S. C. § 816, applied to licenses to use water rights previously held under permits from the Federal Government, whereas this licensee's prior water rights, if any, arise under the law of New York. *In re Niagara Falls Power Co.*, 3 F. P. C. 206, aff'd by the Court of Appeals for the Second Circuit in *Niagara Falls Power Co.* v. *Federal Power Commission*, 137 F. 2d 787.

[6] A proceeding seeking the Commission's approval of a further amendment to Article 11 was consolidated with the show-cause proceedings in the instant case. In response, the Commission, in 1950, ordered that article amended to read:

"After the first 20 years of operation of the project under this license, 6 percent per annum shall be the specified rate of return on the net investment in the project for determining surplus earnings and for the establishment and maintenance of amortization reserves, pursuant to section 10 (d) of the act; one-half of all earnings in excess of 6 percent per annum shall be paid into such amorti-

In 1948, the Commission began this proceeding to determine the licensee's amortization reserve liability. It was the Commission's first such effort under § 10 (d). In 1949, pursuant to a revised staff report, the Commission directed the holder of this license to show cause why one-half of its surplus earnings from March 2, 1941, through December 31, 1946, in the amount of $994,521.33, should not be set aside in an amortization reserve, and why a like proportion of its subsequent surplus earnings should not be set aside annually upon a comparable basis. In 1950, the Commission's presiding examiner recommended that the licensee's initial reserve be $914,432.04, and the Commission approved that figure in preference to $515,432.04 proposed by the licensee. One Commissioner filed a concurring statement and one dissented. 9 F. P. C. 228. However, the Court of Appeals for the District of Columbia Circuit, one judge dissenting, upheld the licensee and remanded the case to the Commission with instructions to modify its order accordingly. 91 U. S. App. D. C. 395, 202 F. 2d 190.[7] The decision turned primarily upon the court's conclusion that neither the Federal Water Power Act nor the issuance of a license thereunder had abolished the licensee's private proprietary rights to use the waters of Niagara River for power purposes. That issue was inescapable because the Commission, in computing the licensee's required amortization reserve, had found that certain annual payments and discounts made by the

---

zation reserves and such amortization reserves shall be established, maintained and disposed of in accordance with the terms of the act and such rules, regulations and orders of the Commission as may be adopted pursuant thereto." 9 F. P. C., at 259.

Under the above amendment, the method of setting aside the amortization reserves may be prescribed by the Commission. 9 F. P. C., at 232–233, 239.

[7] Per curiam. Kimbrough Stone, Circuit Judge, retired, from the Eighth Circuit, sitting by designation; Wilbur K. Miller, Circuit Judge. Dissenting, Bazelon, Circuit Judge.

licensee for its use of private water rights, existing under state law, along the Niagara River, were not allowable expenses for the reason that the Commission considered those rights no longer existent. The Court of Appeals held precisely the contrary and we granted certiorari because of the important bearing of the decision upon the Federal Water Power Act. 345 U. S. 955.

The immediate issue thus presented is whether the licensee's amortization reserve under § 10 (d), for the period from March 2, 1941, through December 31, 1946, should be $914,432.04 or $515,432.04.[8] That difference of $399,000 is one-half of the $798,000 which the Commission believes should be included in the surplus earnings of the licensee for the period. It consists of—

1. $577,500 paid by the licensee, at the rate of $99,000 a year, for its use, for power purposes, of 730 c. f. s. of the "International Paper water rights," and

2. $220,500 allowed by the licensee as a discount, at the rate of $37,800 a year, on certain sales of electric power in consideration of permission to use, for power purposes, 262.6 c. f. s. of the "Pettebone-Cataract water rights."

The Court of Appeals held that although respondent's predecessor, in 1921, had received a federal license for this project, it nevertheless was justified in continuing to meet the financial obligations which it had assumed in return for permission to use water rights originally granted and still existing under the law of New York. That court, accordingly, approved each of the foregoing items of expense and fixed the licensee's initial amortization reserve at $515,432.04.

It was not questioned in the Court of Appeals or here that the licensee originally had acquired, in return

---

[8] For computations, see Appendix, *infra*, p. 257.

for the above-stated payments and discounts, some kind or degree of private proprietary rights under the law of New York to use water from the Niagara River for power purposes. Accordingly, we do not consider it necessary to review here the intricate transactions which resulted in the above-described payments and discounts. We accept the conclusion of the Court of Appeals "that the International Paper and Pettebone-Cataract water rights are valid under the law of New York." 91 U. S. App. D. C., at 406, 202 F. 2d, at 202.[9] For further recognition of these water rights under state law, see *Water Power & Control Commission* v. *Niagara Falls Power Co.*, 262 App. Div. 460, 30 N. Y. S. 2d 371, aff'd, 289 N. Y. 353, 45 N. E. 2d 907; *Niagara Falls Power Co.* v. *Duryea*, 185 Misc. 696, 57 N. Y. S. 2d 777.

Neither is it necessary for us to discuss the licensee's expenses in 1947 or thereafter. They must be treated in the same way as those above mentioned, except to note that the discounts allowed in return for the Pettebone-Cataract water rights ceased with the licensee's purchase of those rights in 1947. See 91 U. S. App. D. C., at 400–401, 202 F. 2d, at 196.

We are not required to determine the nature of the rights claimed by respondent except to recognize that they are usufructuary rights to use the water for the generation of power, as distinguished from claims to the legal ownership of the running water itself. They are rights to use the force of the fall of the water, coupled with an obliga-

---

[9] Respondent's corporate history and the devolution of the title to the International Paper and the Pettebone-Cataract water rights are described by the Court of Appeals in 91 U. S. App. D. C. 395, at 398–402, 402–407, 202 F. 2d 190, at 194–197, 198–202. See also, *Niagara Falls Power Co.* v. *Federal Power Commission*, 137 F. 2d 787. For a detailed examination of the facts and issues of the instant case, see Schwartz, Niagara Mohawk v. FPC: Have Private Water Rights Been Destroyed by the Federal Power Act?, 102 U. of Pa. L. Rev. 31.

tion to return the water to the river under specified conditions.[10] The rights under consideration originally were attached to riparian lands above and below the Falls. However, they long have been separated from such lands and, thus separated, they have been transferred or leased to respondent. Under the law of New York, they constitute a form of real estate known as corporeal hereditaments.[11] The Commission does not now contest the pur-

---

[10] ". . . While the right to its use, as it flows along in a body, may become a property right, yet the water itself, the *corpus* of the stream, never becomes or, in the nature of things, can become, the subject of fixed appropriation or exclusive dominion, in the sense that property in the water itself can be acquired, or become the subject of transmission from one to another. Neither sovereign nor subject can acquire anything more than a mere usufructuary right therein, and in this case the state never acquired, or could acquire, the ownership of the aggregated drops that comprised the mass of flowing water in the lake and outlet, though it could and did acquire the right to its use." *Sweet* v. *Syracuse*, 129 N. Y. 316, 335, 27 N. E. 1081, 1084.

[11] A riparian owner in New York has a right to use the waters of an abutting stream as part of his estate. *United Paper Board Co.* v. *Iroquois Pulp & Paper Co.*, 226 N. Y. 38, 123 N. E. 200; *Waterford Electric Light Co.* v. *New York,* 208 App. Div. 273, 203 N. Y. S. 858, aff'd without opinion, 239 N. Y. 629, 147 N. E. 225.

Recovery by the International Paper Company for the deprivation of its use of the instant water rights in 1917 was authorized by this Court in 1931. Referring to the 730 c. f. s. now before us, Mr. Justice Holmes said for the Court: "From this canal the petitioner, the International Paper Company, was entitled, by conveyance and lease, to draw and was drawing 730 cubic feet per second,—a right that by the law of New York was a corporeal hereditament and real estate." *International Paper Co.* v. *United States*, 282 U. S. 399, 405. The Government was obliged to pay for taking those diversionary rights by condemnation and they are the ones for which respondent is now paying an annual rental of $99,000. The deprivation, therefore, was not an exercise of the Government's dominant servitude, but was a compensable taking by condemnation of the paper company's recognized right to use the water. "[T]he Government took the property that the petitioner owned as fully as the Power Company owned the residue of the water power

chase prices which have been paid for any of these rights. The Commission's present objection is limited to respondent's deduction, in the computation of its amortization reserves, of the annual payments and discounts it has made and which it proposes to make for the use of such rights. The Commission contends (1) that Congress not only may constitutionally abolish such local water rights without compensation but that it already has done so, and (2) that, although the licensee's contested expenditures may be lawful, or even obligatory, between the parties, they must be disallowed in computing the licensee's amortization reserve under § 10 (d).

We conclude, as did the Court of Appeals, that, even though respondent's water rights are of a kind that is within the scope of the Government's dominant servitude, the Government has not exercised its power to abolish them.[12]

---

in the canal." *Id.*, at 408. See also, *Van Etten* v. *City of New York*, 226 N. Y. 483, 124 N. E. 201, and *People ex rel. Niagara Falls Hydraulic Power Co.* v. *Smith*, 70 App. Div. 543, 546, 75 N. Y. S. 1100, 1101, aff'd without opinion, 175 N. Y. 469, 67 N. E. 1088.

[12] The existence of the Pettebone-Cataract water rights, under the law of New York prior to the Federal Water Power Act, is recognized by the courts of that state. *Hydraulic Power Co.* v. *Pettibone Cataract Paper Co.*, 112 Misc. 528, 183 N. Y. Supp. 373, aff'd, 198 App. Div. 644, 191 N. Y. Supp. 12.

Furthermore, Article 13 of the license recognizes at least the possibility of the survival of these rights after the issuance of the license. It provides that in the event the United States or a new licensee shall take over the project "Such taking over of the project shall also be subject *to the rights, if any, of Pettebone-Cataract Paper Company and Cataract City Milling Company to withdraw water at a rate not exceeding 265 cubic feet per second from the Hydraulic Canal or Basin of Licensee, and* to the rights, if any, of International Paper Company. (Italics supplied.)" 6 F. P. C. 184, 185.

In 1947, the licensee secured the approval of the New York Public Service Commission, and of the Securities & Exchange Commission (under § 12 (d) of the Public Utility Holding Company Act of 1935, 49 Stat. 824, 15 U. S. C. § 79*l* (d)), of its purchase of the Pettebone-

While we recognize the dominant servitude, in favor of the United States, under which private persons hold physical properties obstructing navigable waters of the United States and all rights to use the waters of those streams,[13] we recognize also that the exercise of that servitude, without making allowances for preexisting rights under state law, requires clear authorization. A classic example of such a clear authorization appears in *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53. The Act of March 3, 1909, there authorized the exercise of the dominant right of the United States to take all of a navigable river's flow for purposes of interstate commerce. It did so in explicit terms. It said:

> "SEC. 11. . . . the ownership in fee simple absolute by the United States of all lands and property of every kind and description north of the present Saint Marys Falls Ship Canal throughout its entire length and lying between said ship canal and the

Cataract rights from the licensee's parent corporation for $728,415.48. Having thus completed their purchase, the licensee petitioned the Commission to amend Article 13 by striking from it the above italicized reference to these rights. The Commission declined and, accordingly, the original reference to the Pettebone-Cataract rights, as well as that to the rights of the International Paper Company, remains in the license.

The Commission's denial of the requested amendment was on the ground that its consent to the omission of the original equivocal reference to the rights "might be construed as recognizing other alleged water rights claimed by another company." 6 F. P. C., at 188. The Commission took the position that the rights in question had no existence after the enactment of the Federal Water Power Act and it now regards itself as controlled by that reasoning. 9 F. P. C., at 252, 258–259. Its action, however, was not considered by the Court of Appeals to be dispositive of the issue and it is not binding upon us.

[13] *United States* v. *Willow River Power Co.*, 324 U. S. 499; *United States* v. *Chicago, M., St. P. & P. R. Co.*, 312 U. S. 592; *United States* v. *Appalachian Power Co.*, 311 U. S. 377. See also, *United States* v. *Kansas City Ins. Co.*, 339 U. S. 799.

international boundary line at Sault Sainte Marie, in the State of Michigan, is necessary for the purposes of navigation of said waters and the waters connected therewith.

"The Secretary of War is hereby directed to take proceedings immediately for the acquisition by condemnation or otherwise of all of said lands and property of every kind and description, in fee simple absolute. . . .

.        .        .        .        .

"Every permit, license, or authority of every kind, nature, and description heretofore issued or granted by the United States, or any official thereof, to the Chandler-Dunbar Water Power Company . . . shall cease and determine and become null and void on January first, nineteen hundred and eleven . . . ." 35 Stat. 820, 821.

In that case the Government took the entire flow of the stream exclusively for purposes of interstate commerce. The Court accordingly recognized the Government's absolute right, within the bed of the stream, to use all of the waters flowing in the stream, for purposes of interstate commerce, without compensating anyone for the use of those waters.[14]

That decision is not applicable here. The issue here is whether the much more general and regulatory language of the Federal Water Power Act shall be given the same drastic effect as was required there by the language of the Act of March 3, 1909. We find nothing in the Federal Water Power Act justifying such an interpretation. Neither it, nor the license issued under it, expressly

---

[14] It was in this connection that the Court pointed out the inconceivability of private *ownership in the running water* of navigable streams as distinguished from private proprietary *rights to the use of such water* for power and other purposes. *United States* v. *Chandler-Dunbar Co.*, 229 U. S., at 69–70.

abolishes any existing proprietary rights to use waters of the Niagara River. Unlike the statute in the *Chandler-Dunbar* case, the Federal Water Power Act mentions no specific properties. It makes no express assertion of the paramount right of the Government to use the flow of the Niagara or of any other navigable stream to the exclusion of existing users. On the contrary, the plan of the Act is one of reasonable regulation of the use of navigable waters, coupled with encouragement of their development as power projects by private parties.[15]

The Act—

"discloses both a vigorous determination of Congress to make progress with the development of the long idle water power resources of the Nation and a determination to avoid unconstitutional invasion of the jurisdiction of the States. . . .

"The Act leaves to the States their traditional jurisdiction subject to the admittedly superior right of the Federal Government, through Congress, to regulate interstate and foreign commerce . . . ." *First Iowa Cooperative* v. *Federal Power Commission,* 328 U. S. 152, 171.

The Act treats usufructuary water rights like other property rights. While leaving the way open for the exercise of the federal servitude and of federal rights of purchase or condemnation, there is no purpose expressed

---

[15] *Chapman* v. *Federal Power Commission,* 345 U. S. 153, 167–168; *First Iowa Cooperative* v. *Federal Power Commission,* 328 U. S. 152, 180–181. The Act was dedicated to "encouraging private enterprise and the investment of private capital" in power projects on a basis consistent with the public interest. H. R. Rep. No. 61, 66th Cong., 1st Sess. 3. The bill was to provide "a method by which the water powers of the country, wherever located, can be developed by public or private agencies under conditions which will give the necessary security to the capital invested and at the same time protect and preserve every legitimate public interest." Statement of David F. Houston, Secretary of Agriculture. *Id.,* at 5.

252 to seize, abolish or eliminate water rights without compensation merely by force of the Act itself.[16]

The references in the Act to preexisting water rights carry a natural implication that those rights are to survive, at least until taken over by purchase or otherwise.[17] Riparian water rights, like other real property rights, are determined by state law. Title to them is acquired in conformity with that law. The Federal Water Power Act merely imposes upon their owners the additional obligation of using them in compliance with that Act.

The legislative history of the Act discloses no substantial support for the drastic policy which the Commission seeks to read into it. To convert this Act from a regulatory Act to one automatically abolishing preexisting

---

[16] Section 14 even provides: "nor shall the values allowed for *water rights,* rights-of-way, lands, or interest in lands [used in computing a licensee's net investment] be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee: . . . ." (Emphasis supplied.) 49 Stat. 844–845, 16 U. S. C. § 807.

[17] In § 3 (11) "project" is said to include "all water-rights . . . necessary or appropriate in the maintenance and operation of such unit," 49 Stat. 838, 839; § 4 (b) empowers the Commission, in determining the original cost of a project and the net investment in it, to require licensees to show "the price paid for water rights" as well as for lands, 49 Stat. 839; § 9 (b) requires an applicant for a license to submit evidence of whatever compliance he has made with the requirements of state law with respect to "the appropriation, diversion, and use of water for power purposes," 41 Stat. 1068; § 14 requires, when taking over a licensed project, that the "values allowed for water rights" shall not be "in excess of the actual reasonable cost thereof at the time of acquisition by the licensee" (Commissioner Smith emphasized the significance of this clause, 9 F. P. C., at 261), 49 Stat. 844–845; § 23 (b) recognizes the application of state laws to projects where interstate or foreign commerce, public lands and reservations are not affected, 49 Stat. 846; § 27 provides that "nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein," 41 Stat. 1077. See 16 U. S. C. §§ 796–821.

water rights on a nationwide scale calls for a convincing explanation of that purpose. We find none. In fact, the legislative history points the other way. Representative William L. La Follette, of Washington, a member of the House Special Committee on Water Power which reported substantially the same bill as that which in 1920 became the Federal Water Power Act, said of it in 1918:

"This bill is not based on either the Government's ownership or its sovereign authority, but on the hypothesis that we as representatives of the States have authority to act for the States in matters of this character and pass laws for the general good, by the establishment of a limited trusteeship or commission composed of officials of the Government, to carry out and administer this law in such a way as not to infringe any of the rights of the States nor to impede or restrict navigation, but rather to benefit it. . . . Under this bill we only allow the commission a supervisory power over those functions entirely within the State's jurisdiction for the period covered by any license, the State having exercised its rights in advance of issue." 56 Cong. Rec. 9110.

Shortly thereafter he added:

"If we put in this language [of § 9 (b)], which is practically taken from that Supreme Court decision [*United States* v. *Cress,* 243 U. S. 316], as to the property rights of the States as to the bed and the banks and to the diversion of the water, then it is sure that we have not infringed any of the rights of the States in that respect, or any of their rules of property . . . . We are earnestly trying not to infringe the rights of the States." *Id.,* at 9810.[18]

---

[18] In 1917, the Senate Committee on Commerce said:
"[T]he bill is so framed as to protect and maintain the constitutional power and control of the Federal Government over navigable

In 1930, this Court passed upon the basic question now before us when it came here in a different connection. In *Ford & Son* v. *Little Falls Co.*, 280 U. S. 369, Mr. Justice Stone, writing for a unanimous Court, held that a riparian owner of a right to use water for power purposes in the navigable Mohawk River, in New York State, was entitled to an injunction against the uncompensated destruction of that right by a subsequent licensee under the Federal Water Power Act. The New York Supreme Court had granted such an injunction and awarded damages. This Court affirmed that decision, although the federal license then before the Court had authorized the licensee to raise the navigable waters of the Hudson River to such an extent that they would destroy the value of the riparian owner's right, under state law, to use the fall of tributary waters of the Mohawk for power purposes. It was thus held that the Federal Water Power Act had not abolished the complainant's private proprietary water rights, existing under New York law, to use navigable waters for power purposes.[19]

> "[E]ven though the rights which the respondents [the riparian owners] here assert be deemed subordinate to the power of the national government to control navigation, the present legislation does not purport to authorize a licensee of the Commission

---

streams, as well as the sovereignty of the States and the rights of riparian proprietors over and in the beds and waters of those streams, and allow the full exercise and enjoyment of the latter, subject to the paramount authority of Congress to regulate the same for navigation purposes." S. Rep. No. 179, 65th Cong., 2d Sess. 4, as to S. 1419.

For a history of the congressional debates and hearings, see Kerwin, Federal Water-Power Legislation (1926).

[19] The Court refrained from determining whether § 21 of the Act, as to eminent domain, gave the licensee a further right to condemn and thus pay for the preexisting rights. *Id.*, at 379.

to impair such rights recognized by state law without compensation." *Id.*, at 377.

After quoting from §§ 10 (c) (liability for damages caused by the licensed project), 27 (saving clause as to proprietary rights under state law), 21 (condemnation rights) and 6 (licensee's acceptance of the conditions of the Act), the Court added:

> "While these sections are consistent with the recognition that state laws affecting the distribution or use of water in navigable waters and the rights derived from those laws may be subordinate to the power of the national government to regulate commerce upon them, they nevertheless so restrict the operation of the entire act that the powers conferred by it on the Commission do not extend to the impairment of the operation of those laws or to the extinguishment of rights acquired under them without remuneration. We think the interest here asserted by the respondents, so far as the laws of the state are concerned, is a vested right acquired under those laws and so is one expressly saved by § 27 from destruction or appropriation by licensees without compensation, and that it is one which petitioner [the licensee], by acceptance of the license under the provisions of § 6, must be deemed to have agreed to recognize and protect." *Id.*, at 378–379.

Parallel reasoning has been applied in a case involving a conflict between a licensee and the holder of state-recognized rights to use water from a navigable stream for irrigation purposes. *United States* v. *Gerlach Live Stock Co.*, 339 U. S. 725, 734. See also, as to state-created water rights for power purposes, *Grand River Dam Authority* v. *Grand-Hydro,* 335 U. S. 359, 372; *Pike Rapids Power Co.* v. *Minneapolis, St. P. & S. S. M. R. Co.,* 99 F. 2d 902; *United States* v. *Central Stockholders' Corp.,* 52 F. 2d 322; *Rank* v. *Krug,* 90 F. Supp. 773, 793; *Great*

*Northern R. Co.* v. *Washington Electric Co.,* 197 Wash. 627, 86 P. 2d 208.

In *First Iowa Cooperative* v. *Federal Power Commission,* 328 U. S. 152, at 175–176, § 27 of the Act was discussed in relation to conditions controlling the approval of projects. The language there used is applicable to proprietary water rights for power purposes as well as those for other proprietary uses. To any extent that statements in *Alabama Power Co.* v. *Gulf Power Co.,* 283 F. 606, cited in the *First Iowa* case, indicate a different interpretation, they are not controlling.

Respondent's private property rights are rooted in state law, subject to the paramount rights of the State and Nation. In the instant case, both the State and the Nation have made limited assertions of their superior rights. New York has done so through its rental charges and the Nation through its license. Neither, however, has laid claim to such an exclusive right to the waters as eliminates the limited use which respondent here seeks to make of them.

The findings of the Commission and the action of the Court of Appeals disclose no sufficient additional circumstances demonstrating the unreasonableness of the expenses in question.[20]

The judgment of the Court of Appeals, accordingly, is

*Affirmed.*

MR. JUSTICE REED withdrew from the consideration and decision of this case.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

[For dissenting opinion, see p. 258.]

---

[20] Claims of the State of New York, in its own favor, suggested in its brief or oral argument as *amicus curiae,* are not before us.

*Appendix.*—The Commission's computation, 9 F. P. C., at 258, is reached as follows:

| "Period | Base | Earnings | Specified return (6 percent) | Surplus earnings | Amortization reserve credits |
|---|---|---|---|---|---|
| Mar. 2, 1941 to Dec. 31, 1941 | $36,101,556.74 | $2,480,131.61 | $1,805,077.84 | $675,053.77 | $337,526.88 |
| Year 1942 | 35,817,450.85 | 2,600,032.64 | 2,149,047.05 | 450,985.59 | 225,492.80 |
| Year 1943 | 35,464,320.95 | 2,298,684.44 | 2,127,859.26 | 170,825.18 | 85,412.59 |
| Year 1944 | 34,925,610.46 | 1,952,641.25 | 2,095,536.63 | (142,895.38) | |
| Year 1945 | 34,076,789.61 | 2,027,324.21 | 2,044,607.38 | (17,283.17) | |
| Year 1946 | 33,286,819.28 | 2,689,387.25 | 1,997,209.16 | 692,178.09 | 265,999.77 |
| Mar. 2, 1941 to Dec. 31, 1946 | ---- | 14,048,201.40 | 12,219,337.32 | 1,828,864.08 | 914,432.04" |

The above computation offsets the deficits of 1944 and 1945 against the surplus earnings of 1946 and reduces the total amortization reserve from the $994,521.33, recommended in the revised staff report, to the $914,432.04 approved by the presiding examiner and Commission. See *id.*, at 248–250.

Respondent's computation, approved by the Court of Appeals, is reached as follows:

| "Period | Base | Earnings | Specified Return (6%) | Surplus Earnings | Amortization Reserve Credits |
|---|---|---|---|---|---|
| Mar. 2, 1941 to Dec. 31, 1941 | $36,101,556.74 | $2,366,131.61 | $1,805,077.84 | $561,053.77 | $280,526.89 |
| Year 1942 | 35,817,450.85 | 2,463,232.64 | 2,149,047.05 | 314,185.59 | 157,092.79 |
| Year 1943 | 35,464,320.95 | 2,161,884.44 | 2,127,859.26 | 34,025.18 | 17,012.59 |
| Year 1944 | 34,925,610.46 | 1,815,841.25 | 2,095,536.63 | (279,695.38) | |
| Year 1945 | 34,076,789.61 | 1,890,524.21 | 2,044,607.38 | (154,083.17) | |
| Year 1946 | 33,286,819.28 | 2,552,587.25 | 1,997,209.16 | 555,378.09 | 60,799.77 |
| Mar. 2, 1941 to Dec. 31, 1946 | ---- | $13,250,201.40 | $12,219,337.32 | $1,030,864.08 | $515,432.04" |

This reduces the earnings by deducting from them the payments and discounts here in controversy. See 91 U. S. App. D. C., at 397–398, 202 F. 2d, at 193.

258

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE MINTON concur, dissenting.

Section 10 (d) of the Federal Power Act, 41 Stat. 1069, as amended, 16 U. S. C. § 803 (d), requires licensees to set up amortization reserves out of their surplus earnings. The Commission enforced this requirement by ordering Niagara to make a book transfer of surplus earnings to an amortization reserve account. In determining the amount of earnings available for amortization the Commission refused to allow certain water-right payments as expenses. The only question before the Court is whether the Commission could lawfully disregard these expenses in computing Niagara's earnings for § 10 (d) purposes.

The amortization reserve required by § 10 (d) serves the function of reducing Niagara's net investment. § 3 (13). Niagara's net investment is the measure of the amount the United States must pay if it decides to recapture Niagara's plant under § 14 of the Act.[1] By allowing these water-right payments as expenses for this purpose the Court increases the ultimate obligation of the United States.

It may be that Niagara is under a legal duty to pay for its water rights under state law. And I agree that the Federal Power Act was not intended to interfere with water rights created by state law. But it is not true that the United States can be made to pay, directly or indirectly, for the use of the waters of a navigable stream. That has been settled at least since *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53.[2] "Ownership of a private stream wholly upon the lands of an individual is

---

[1] The same is true in case the United States moves to acquire the properties under § 26 by judicial sale.

[2] See also *United States* v. *Chicago, M., St. P. & P. R. Co.,* 312 U. S. 592; *United States* v. *Commodore Park, Inc.,* 324 U. S. 386; *United States* v. *Willow River Co.,* 324 U. S. 499.

conceivable; but that the running water in a great navigable stream is capable of private ownership is inconceivable." *Id.*, p. 69. If Niagara must pay for its water rights without being reimbursed by the United States, that is the price Niagara must pay for its federal license. See *United States* v. *Appalachian Power Co.*, 311 U. S. 377; cf. *Regents* v. *Carroll*, 338 U. S. 586. The Federal Power Act should not be construed as requiring the United States to pay for something it already owns.[3] But that is precisely what the Court does today.

---

[3] The command of § 14 is otherwise. It excludes from the "net investment," which must be paid if the Federal Government decides to recapture the project, "the value of any lands, rights-of-way, or other property of the United States licensed by the Commission under this Act."