**ALABAMA POWER COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 71-2909.

United States Court of Appeals,
Fifth Circuit.

July 31, 1973.

John Bingham, S. Eason Balch, Rodney O. Mundy, Birmingham, Ala., for petitioner.

Kenneth F. Plumb, Sec. of F.P.C., Gen. Counsel, Leo Forquer, John S. Everett, Staff Counsel, Michael N. Mervin, Platt W. Davis, III, George W. McHenry, Jr., Acting Sol., F.P.C., Washington, D. C., for respondent.

Before WISDOM and INGRAHAM, Circuit Judges, and BOOTLE, District Judge.

INGRAHAM, Circuit Judge:

This is a proceeding under § 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), for the review of an order of the Federal Power Commission requiring Alabama Power Company to establish an amortization reserve account for the licensee's Project No. 82 pursuant to § 10(d) of the Federal Power Act, 16 U.S.C. § 803(d).[1] Section 10(d) requires a licensee to establish an amortization reserve account which will reflect excess or surplus earnings of a particular hydroelectric project if such earnings have accumulated in excess of a specified (in the license) reasonable rate of return upon the actual, legitimate investment[2] in the project during a period beginning after the first twenty years of operation. The amount transferred to the amortization reserve account may be used pursuant to § 10(d) to reduce a licensee's net investment in the project. 16 U.S.C. § 803(d). This

1. This section was part of the Federal Water Power Act of 1920, 41 Stat. 1063, as amended, and is now in Part I of the Federal Power Act, 16 U.S.C. § 791a–823. "The Federal Power Act consists of three parts. The first part, in general, provides for the creation of the Federal Power Commission, the improvement of navigation and the development of water power. 16 U.S.C.A. § 791–823. Part II of such Act, in general, provides for the regulation of electric companies engaged in interstate commerce. 16 U.S.C.A. §§ 824–824h. Part III of such act, in general, relates to licensees and public utilities and contains procedural and administrative provisions. 16 U.S.C.A. §§ 825–825r."

Northwestern Elec. Co. v. Federal Power Com'n, 125 F.2d 882, 884 (9th Cir., 1942).

2. In 1935 the Federal Water Power Act was amended, and became Part I of the Federal Power Act. See note 1, *supra.* The phrase "actual, legitimate investment" was deleted from § 10(d) and the phrase "net investment" substituted in its place. 41 Stat. 1068. The issues in this case arise primarily because of the use of the term "actual, legitimate investment" in the 1920 Act and in licenses issued under it. *See* Textual discussion under I of this opinion, *infra.* Section 10(d) was again amended in 1968, Pub.L. 90–451, § 4, 82 Stat. 617, but this amendment has no bearing on the resolution of this case.

means that if, after expiration of the license, the government decided to take over or recapture the project under § 14 of the Federal Power Act, 16 U.S.C. § 807,[3] it will be required to compensate the licensee for its net investment in the project reduced by the amortization reserve for the project.[4]

We are concerned here with Alabama Power's Project No. 82 (the Mitchell Dam on the Coosa River in Alabama). On August 15, 1943, Project No. 82 completed its first twenty years of operation, thus becoming subject to § 10(d) for periods after this date. On November 1, 1959, the Commission's accounting staff concluded that Alabama Power had derived excess earnings from Project No. 82 for the period from August 15, 1943 through December 31, 1949. It was therefore recommended that the licensee transfer certain funds from Account 216, Unappropriated Retained Earnings to Account 264, Amortization Reserve-Federal.[5] Believing that the

---

3. This section provides:

Upon not less than two years' notice in writing from the commission the United States shall have the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project or projects as defined in section 796 of this title, and covered in whole or in part by the license, or the right to take over upon mutual agreement with the licensee all property owned and held by the licensee then valuable and serviceable in the development, transmission, or distribution of power and which is then dependent for its usefulness upon the continuance of the license, together with any lock or locks or other aids to navigation constructed at the expense of the licensee, upon the condition that before taking possession it shall pay the net investment of the licensee in the project or projects taken, not to exceed the fair value of the property taken, plus such reasonable damages, if any, to property of the licensee valuable, serviceable, and dependent as above set forth but not taken, as may be caused by the severance therefrom of property taken, and shall assume all contracts entered into by the licensee with the approval of the Commission. The net investment of the licensee in the project or projects so taken and the amount of such severance damages, if any, shall be determined by the Commission after notice and opportunity for hearing. Such net investment shall not include or be affected by the value of any lands, rights-of-way, or other property of the United States licensed by the Commission under this chapter, by the license or by good will, going value, or prospective revenues; nor shall the values allowed for water rights, rights-of-way, lands, or interest in lands be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee: *Provided,* That the right of the United States or any State or municipality to take over, maintain, and operate any project licensed under this chapter at any time by condemnation proceedings upon payment of just compensation is expressly reserved.

4. For purposes of recapture under § 14 of the Act, the computation of a licensee's net investment—the amount required to be paid to a licensee in the event of recapture—in a project would be governed by § 3(13) of the Act, 16 U.S.C. § 796(13). The purpose of § 10(d) "was to compel a reservation of a *portion* of the earnings and to remove them from being available for distribution of dividends." Order No. 387, 42 FPC 329, 332–33 (1969). The relationship of § 10(d) with § 3(13) and § 14 is that a § 10(d) allocation proceeding, the purpose of which is to determine the amount which must be transferred to the amortization reserve account, is the first step in preparation for recapture under § 14; recapture may never occur, but as a part of government regulation a licensee must have his accounts in order in anticipation of this contingent event. The next step would be for the government, upon termination of the license (after fifty years of operation), to initiate recapture proceedings under § 14. Section 3(13) would then be used to determine the licensee's net investment in the project. Once this determination is made, the amortization reserve account, established pursuant to § 10(d), could be used to further reduce the net investment figure to arrive at the final figure to be paid to the licensee whose project has been recaptured.

5. The account numbers used in the text are those prescribed by the Commission's Uniform System of Accounts Prescribed for Public Utilities and Licensees, which were effective from Jan-

Project had not accumulated excess earnings and also objecting to the methods used by the staff in reaching its result, Alabama Power appealed the staff's decision. The Presiding Examiner, after conducting appropriate hearings, upheld the staff's recommendation. The company then proceeded to the Commission. Briefs were filed and oral argument was held on May 19, 1964. In the meantime, and before the Commission had reached a decision, the Commission decided that it was necessary to establish a method for determining a licensee's net investment in a project as that term is used in § 3(13) of the Federal Power Act, 16 U.S.C. § 796(13).[6] A notice of proposed rulemaking was issued on January 20, 1966. Because the establishment of amortization reserves under § 10(d) is related to the computation of net investment in a project under § 3(13),[7] the instant proceedings were deferred pending the outcome of the rulemaking. The Commission was unable, however, to come up with a satisfactory uniform method of calculating net investment. On September 27, 1968, the Commission issued Order No. 370, 40 FPC 1351, setting forth the proposed formula. After numerous objections were filed, a rehearing was held, the re-

sult being that on August 4, 1969, Order No. 387, 42 FPC 330, was issued which concluded that Order No. 370 should be set aside and the rulemaking terminated.

After this interlude the present proceedings resumed. The Commission upheld the Presiding Examiner in all respects save two.[8] Alabama Power brought this petition for review of Commission Opinion No. 596, —— FPC —— (1971), when it failed to obtain the relief it desired on rehearing before the Commission.

Project No. 82 is only a part of Alabama Power's power generating system. The complete system is referred to as the Electric Department. While a licensee is required to keep detailed accounting records as to the total earnings of the whole system, it is not required to identify earnings as attributable to a particular project. Thus, because we are concerned with the excess earnings of only one project in the system, No. 82, it is necessary to allocate a portion of the Electric Department's earnings to No. 82 in order to determine if this project produced excess earnings for the period in question.

Both Alabama Power and the FPC agree on the allocation formula. "The

---

uary 1, 1937 through December 31, 1960. The Commission revised this system of accounts effective January 1, 1961, but this revision does not affect the present proceedings and, as did the FPC staff and the Commission, we will refer to the accounts prior to the 1961 revision.

6. This section provides:
   * * * "net investment" in a project means the actual legitimate original cost thereof as defined and interpreted in the "classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission", plus similar costs of additions thereto and betterments thereof, minus the sum of the following items properly allocated thereto, if and to the extent that such items have been accumulated during the period of the license from earnings in excess of a fair return on such investment: (a) Unappropriated surplus, (b) aggregate

credit balances of current depreciation accounts, and (c) aggregate appropriations of surplus or income held in amortization, sinking fund, or similar reserves, or expended for additions or betterments or used for the purposes for which such reserves were created. The term "cost" shall include, insofar as applicable, for elements thereof prescribed in said classification, but shall not include expenditures from funds obtained through donations by States, municipalities, individuals, or others, and said classification of investment of the Interstate Commerce Commission shall insofar as applicable be published and promulgated as a part of the rules and regulations of the Commission;
   * * *.

7. See note 4, supra. See generally Order No. 387, 42 FPC 330 (1969).

8. See Opinion No. 596, supra, at ¶¶ 82 and 83.

formula states that the proportional relationship of project earnings to investment base of the project shall be equal to the proportional relationship of Electric Department earnings to investment base of the Electric Department." [9] Order No. 596, *supra*, at ¶ 15. Once the project earnings are determined, it will be a relatively simple task to ascertain the amount of those earnings which can be labeled "excess or surplus" as exceeding the licensee's specified reasonable rate of return. The controversy, therefore, centers around the proper method of computing project earnings. It is at this point that the company hopes to reduce the ultimate amount of excess earnings required to be transferred to the amortization reserve account.

The issues in this case can be further narrowed. The true unknown in the allocation formula is project earnings. The Electric Department earnings are determinable by reference to the licensee's books.[10] Generally, the investment base of both the project and the Electric Department is not difficult to determine. But the problem—which is the crux of this case—is resolving what elements should comprise the investment base. Alabama Power disagrees with the Commission in four particular areas and these form the issues to be resolved here: (1) the term "actual, legitimate investment" as used in § 10(d) of the Act, and in Article 17 of the license, contemplates an investment base undiminished by depreciation reserves; (2) the unamortized portion of the Plant Acquisition Adjustments Account should be included in the Electric Department investment base;[11] (3) the Electric Department investment base should include contributions in aid of construction; and (4) construction work in progress should be included in the investment base of both the Electric Department and the project. As can be seen, each issue relates to an effort by the company to increase the investment base (the denominator of the allocation equation) of either the Electric Department or the project, or both. If the company can increase the denominator of the equation, then naturally the resulting percentage will be lower. When this lower earnings percentage is applied to Electric Department earnings to determine the allocable portion of Project No. 82 earnings, a lower dollar amount will result. The company's goal would thus be achieved—lower project earnings and correspondingly decreased excess earnings required to be transferred to the amortization reserve account.

## I.

We turn first to a consideration of whether—as the Commission held—the

9. This formula is expressed as follows:

$$\frac{X}{\text{Project Investment Base}} = \frac{\text{Electric Department Earnings}}{\text{Electric Department Investment Base}}$$

$$X = \text{Project Earnings}$$

10. Initially there was a dispute concerning the elements to be included in the Electric Department's earnings (the numerator in the allocation formula) with the company arguing for decisions which would reduce these earnings. In this petition for review, however, we are only concerned with issues relating to the investment base, the other issues having been resolved at the administrative level.

11. In addition to determining the proper disposition of the unamortized portion of the acquisition adjustments account, there is the related problem concerning the proper treatment of the annual amortization expense. Since this latter problem will be resolved once the proper method of treating the acquisition adjustments account has been determined, it is not necessary to consider the annual charges separately.

investment base of both the Electric Department and the project for purposes of allocation should not include depreciation reserves. The resolution of this question turns on the meaning of "actual, legitimate investment" as that term was used in § 10(d) of the Federal Water Power Act of 1920, in Regulation 17 of the Commission's Rules and Regulations, First Revised Issue, effective June 6, 1921, and in Article 17 of the license issued to Alabama Power for Project No. 82.[12] The parties have created a mystery surrounding the meaning of this term and have developed complex arguments based primarily on legislative history and 1920 accounting principles in quest of their differing solutions to this mystery.[13] We have concluded, nevertheless, that the issue is resolved very simply. For after all is said and done, and we return to the beginning, the Act and the license, we find that "actual, legitimate investment" is defined in the license, and that the definition there contemplates an undepreciated investment base. The controversy must end once that conclusion has been reached.

As originally enacted § 10(d) of the Federal Water Power Act of 1920 reads as follows:

"That after the first tweny years of operation, out of surplus earned thereafter, if any, accumulated in excess of a specified reasonable rate of return upon the *actual, legitimate investment* of a licensee in any project or projects under license, the licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until termination of the license or be applied from time to time in reduction of the net investment. Such specified rate of return and the proportion of such surplus earnings to be paid into and held in such reserves shall be set forth in the license."

Federal Water Power Act, § 10, ch. 285, 41 Stat. 1068 (1920), as amended 16 U.S.C. § 803(d) (1968) (emphasis added). Section 1 of Regulation 17 of the Commission's 1921 Rules and Regulations tracks the language of § 10(d).[14] Section 2 of this regulation defines the term "actual, legitimate investment" for purposes of "this regulation and of Section 10(d) of the act" in the following manner:

"*Actual, legitimate investment* means the net debit balance in the fixed capital accounts of a project or projects of items properly includible therein under the accounting rules and regulations of the commission."

---

12. Opinion No. 596, *supra*, at ¶ 32. This paragraph is quoted in the text *infra*.

13. We agree with the following observations of the Commission concerning the impact of legislative history and accounting principles prevalent at the time the license was issued:

Each party to this proceeding has relied on the legislative history of the Federal Water Power Act as support for its portion on deduction of depreciation, but the reliance in each case has not produced conclusive argument. The disarray found in the accounting theory of the 1920's surfaces here, in the legislative history, as well as in the arguments relating to interpretation of the Commission's regulations.

Id. at ¶ 39.

14. SECTION 1. *General requirements.—* REGULATION 17.— AMORTIZATION RESERVES.
[*As amended June 6, 1921*]
After the first 20 years of operation, out of surplus earned thereafter, if any, accumulated in excess of a specified reasonable rate of return upon the actual, legitimate investment of a license in any project or projects under license the licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the commission, be held until the termination of the license or be applied from time to time in reduction of the net investment. Such specified rate of return and the proportion of such surplus earnings to be paid into and held in such reserve shall be set forth in the license.

Regulation 17 is incorporated into Article 17 of Alabama Power's license for Project No. 82.[15]

As the Commission recognized:

"Even though Section 10(d) relates to computing excess earnings, based on a comparison of allocated earnings and the specified reasonable return, and even though it does not directly govern allocation of earnings, it nevertheless provides that the investment in the project is the 'actual, legitimate investment' in the project. *Facing the problem of defining this phrase is thus made a prerequisite to allocating earnings to the project.*"

Opinion No. 596, *supra*, at ¶ 32 (emphasis added). Because this phrase is defined in Article 17 of the license by reference to Commission Regulation 17 as being the "net debit balance in the fixed capital accounts," we must determine what role depreciation plays in arriving at the net debit balance of the fixed capital accounts. If depreciation is deducted in arriving at this balance, then the phrase "actual, legitimate investment" means a figure computed by deducting depreciation. If, in arriving at the net debit balance in the fixed capital accounts, depreciation is not deducted, however, then "actual, legitimate investment" must mean a figure calculated without reduction of depreciation. For the answer, we look to the testimony before the Presiding Examiner of Paul J. Arrington, the FPC staff's expert witness:

". . . The term 'net debit balance,' as used in the Regulation 17 refers to the fixed capital accounts and the net debit balance in the fixed capital accounts is the original project cost plus additions minus retirements.

PRESIDING EXAMINER: And depreciation?

THE WITNESS: Not depreciation. Depreciation is not recorded in the fixed capital accounts. The net debit balances in the fixed capital accounts would be only the original cost of the property as originally constructed plus the cost of additions and minus the cost of retirements and minus the cost of any amounts representing donations, donations in aid of construction.

Now, it is our position that the definition of 'actual legitimate investment' in Regulation 17, is not correct in view of the clarification amendment of the Act in 1935."

Neither party has presented, and our independent research has not disclosed, any reason to conclude that the staff's expert erroneously defined the phrase "net debit balance in the fixed capital accounts." It is thus clear that the term "actual, legitimate investment" as defined by Commission Regulation 17 for purposes of § 10(d) of the 1920 Act and for the license to Project No. 82 means a figure calculated without a reduction of depreciation reserves. Therefore, unless there is a reason to ignore this definition, it must control this case, and Alabama Power's investment base for allocation purposes should not be reduced by depreciation.

The amendment of § 10(d) in 1935 does not furnish a basis for ignoring the 1920 definition of "actual, legitimate investment." We realize, of course, that when the Federal Water Power Act was amended in 1935 to become Part I of the Federal Power Act, the term "actual, legitimate investment" as used in § 10(d) of the original version of the Act, was changed to read "net investment." The

---

15. The relevant portion of Article 17 reads as follows:

*Article 17.*—After the first 20 years of operation of said project under this license, out of surplus earnings thereafter, if any, (950) accumulated in excess of a specified reasonable rate of return upon the actual, legitimate investment of the Licensee in said project, all as defined in and determined by the provisions of Regulation 17 of said rules and regulations of the Commission, the Licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until the termination of the license or be applied from time to time in reduction of the net investment.

FPC relies heavily on the evidence that this amendment was made merely for clarification and was not intended to substantively change the meaning of this section.[16] But, notwithstanding the arguments to the contrary, we have held that the term, as used in Alabama Power's license for Project No. 82, is clearly defined. We cannot ignore this definition on the ground that—in Mr. Arrington's words—"the definition of 'actual legitimate investment' in Regulation 17 is not correct." That definition, even though it may not be "correct," is the definition which is correct for purposes of determining the meaning of actual, legitimate investment in this allocation case which has its roots in a license issued before the alleged correction in the

definition. "A license issued under Part I of the Federal Power Act may not be altered except by agreement between the Federal Power Commission and the licensee. (§ 6 of the Act [16 U.S.C. § 799]). The Commission has no power, acting alone, to amend or in any way change an outstanding license." Niagara Mohawk Power Corp. v. Federal Power Com'n, 91 U.S.App.D.C. 395, 202 F.2d 190, at 198 n.3 (1952), aff'd, 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 666 (1954). *See* Alabama Power Co. v. Federal Power Com'n, 291 F.2d 558 (5th Cir., 1961).

Through an analysis influenced by a desire to implement what it believed to be sound policy considerations [17] the Commission held that actual,

---

16. *See* H.R.Rep.No.1318, 74th Cong., 1st Sess., at 24 (1935) and S.Rep.No.621, 74th Cong., 1st Sess., at 17, 45 (1935).

17. The policy considerations underlying the Commission's decision are adequately summarized by this statement from Opinion 596 at ¶ 34:

> The practical effects of not deducting depreciation, depending on the relative ages of the project and the remainder of the system, were clearly described by the examiner. From the point of view of the ratepayer who pays for annual depreciation expense, logic and fairness compel deduction of depreciation in this proceeding as well as in rate proceedings. In a rate proceeding, if the rate of return were applied to gross investment rather than a depreciated rate base, the licensee would receive a double recovery of its investment in plant. Since the licensee has collected depreciation charges from the ratepayers, it is not logical to argue that the amortization reserve must be computed on a non-depreciated base. If such a base were used, the excess earnings would be reduced, the compensation paid to the licensee would be that the licensee would receive another form of double recovery. This would be patently unfair to the ratepayers.

This statement overlooks at least one consideration. As explained in note 4, *supra*, and as recognized by the Commission in Order No. 387, 42 FPC 329 (1969) § 10(d)'s primary purpose is to provide a regulatory tool to prevent a licensee from distributing its "excess"

profits to its shareholders. These excess profit are to be set aside in an amortization reserve account to be used in the event the government recaptures a project. Section 3(13) defines the amount to be paid in the event of recapture as the "net investment" of the licensee in the project. This section then details the manner in which to compute net investment. It is significant that this computation requires the deduction of depreciation. Pursuant to § 10(d), the amortization reserve account can be used to reduce this net investment. Therefore, under the Commission's interpretation of actual, legitimate investment, depreciation would be deducted twice—once in computing net investment under § 3(13) and again when the net investment is reduced by the amortization reserve, because the amortization reserve was computed by deducting depreciation. Perhaps this is a proper policy determination. But, it can be plausibly argued that, at least in 1920, this determination had not been made and that this explains the use of the phrase "actual, legitimate investment" instead of "net investment" in § 10(d). The legislative history is not revealing, much less decisive, on this point.

We are thus left, as we have previously reasoned, with the definition of the term "actual, legitimate investment" as it appears in the license and the Act. Contrary to the Commission's statement in ¶ 42 of Opinion 596 that there had not been, prior to the instant case, an attempt to define actual legitimate investment, we are convinced that Regulation 17 clearly defines the term.

legitimate investment means a depreciated investment base. Paragraph 35 of its opinion is illustrative.

"The staff has offered an unconvincing argument that the phrase, 'actual, legitimate investment,' as defined by the reference in Regulation 17 to 'net debit balance,' requires deduction of depreciation. However, we take note of the fact that at the time the regulations were written, a profound difference of opinion existed within the accounting profession with regard to the accounting treatment of depreciation. Regulation 17, as interpreted by the licensee, did not reflect the thinking which was beginning to prevail within accounting circles at the time the license was issued. Furthermore, it is unlikely that anyone carefully explored the exact meaning of the terms in Regulation 17 since, by law under Section 10(d), Regulation 17 would not be applied for twenty years."

Thus, the Commission, at least implicitly, recognized that actual, legitimate investment, defined in Regulation 17 as the "net debit balance in the fixed capital accounts" does not require deduction of depreciation. Nevertheless, the Commission side-stepped this conclusion by reasoning that "the issue should be stated in terms of clarifying what has been heretofore an unclear Commission policy, from the point of view of Alabama Power Company and other licensees. The issue then becomes whether the Commission can legally prescribe a new rule, in spite of the estoppel and binding contract questions." Opinion No. 596, *supra*, at ¶ 40. The Commission then concluded that "the Commis-

sion's discretion to prescribe a precise rule is clear." *Id.* at ¶ 46. The Commission's formulation of the issue and the analysis resolving it in favor of the FPC were based on the premise that the meaning of actual, legitimate investment, as used in Alabama Power's license, needed clarifying. That we disagree with this premise is clear from our earlier analysis of § 10(d), prior to amendment, Regulation 17, and Article 17 of Alabama Power's license. For this reason, we cannot accept the Commission's conclusion that petitioner's investment base must be determined by deducting depreciation reserves.[18] We, therefore, set aside that portion of the Commission's order which required Alabama Power to allocate earnings to Project No. 82 on the basis of a depreciated investment base.

## II.

"When a utility acquires property to be used as an operating unit, and when the purchase price is more than the original cost of the property less the accumulated provision for depreciation and amortization as of the time of the acquisition, the excess portion of the purchase price is placed in Account 100.5, Electric Plant Acquisition Adjustment. It is then amortized over a period of years."

Opinion No. 596, —— F.P.C. ——, at ¶ 60 (1971). Alabama Power's electric plant acquisition adjustments account contained a "substantial sum" referable to the period involved in this § 10(d) allocation proceeding. The company argued that this sum should be included in the Electric Department's investment base,[19] but this contention was rejected

---

18. We have reached this conclusion well aware that in reviewing the action of an administrative agency the scope of our review is limited. However, contrary to the position taken by the FPC in its appellate brief, our scope of review on this issue is not governed by the substantial evidence rule because we have not been dealing with agency conclusions based on findings of disputed facts. We have, nonetheless, under familiar principles of administrative law deferred to agency expertise in this area but remain firmly convinced that the FPC's conclusions are plainly erroneous, whether viewed under a substantial evidence, a rational basis, or a reasonableness standard.

19. No portion of this account is attributable to Project No. 82. Opinion No. 596, —— FPC ——, ¶ 60 at n. 24 (1971).

by the staff and the Examiner. The Commission, however, accepted the company's argument for including such unamortized sums in the Electric Department's investment base and adopted the following standard as the test for determining whether inclusion is appropriate in a particular allocation proceeding.

"We think that in an amortization reserve proceeding our treatment of the unamortized portion of the acquisition adjustments account should be determined by reference to the policy of the state regulatory commission which sets the retail rates for the utility owning the project. To the extent that a state commission in a rate proceeding has actually allowed acquisition adjustments in the rate base, the Federal Power Commission, for allocation purposes only, will allow such amounts in the earnings (investment) base of the company's electric department and in the earnings base of the project if such amounts relate to the project. This policy will apply only if the allocation formula is the same as that used in this proceeding."

Opinion No. 596, *supra*, at ¶ 70. The reason for establishing this new standard was explained as follows:

"The annual earnings figure for the company's electric department is the starting point in allocating earnings. Since this figure results from the rates set by the state commission, it is proper for the Federal Power Com-

mission when considering earnings base components both to recognize the relationship between earnings and earnings base and to incorporate in its determination the state commission's rate base policy relating to the issue of acquisition adjustments."

*Id.* at ¶ 71. In short, unamortized acquisition adjustments will be included in a licensee's investment base in a § 10(d) allocation proceeding if the state regulatory agency having authority over the licensee's retail rates permits the licensee to include such amounts in its rate base; the touchstone is state regulatory policy.

This standard was that advocated by Alabama Power. The company's apparent victory proved hollow, however, because the Commission held that Alabama Power had "not clearly demonstrated that for the amortization reserve period involved in this proceeding, the Alabama Commission included acquisition adjustments in its rate base." [20] The company's evidence before the Commission when this determination was made consisted of an exhibit relating to accounting adjustments, first approved by the Alabama Public Service Commission in 1945, which allowed the company to amortize Account 100.5, Electric Plant Acquisition Adjustments, by charges to Account 505, Amortization of Electric Plant Acquisition Adjustments. Since the latter account is an operating revenue deduction account (an above-the-line entry),[21] the inference sought by the company is that this allowance was in-

---

20. *Id.* at ¶ 73.

21. The distinction between above-the-line and below-the-line accounts is that an expenditure entered in a below-the-line account operates to reduce distributable income of the licensee without a corresponding inclusion of the expenditure in determining the rate base. Hence, although an expenditure entered below-the-line is properly classed as an expense, it is not an operating expense (a cost of service) which can be recouped through charges to the ratepayer. Above-the-line accounts are charged to operating expenses and are considered in determining a licensee's rate base.

Although the initial accounting entry classifying an expenditure is not binding in a subsequent rate-determination case, it is, practically speaking, very difficult for a company to establish that a below-the-line entry should be considered as a part of the cost of service and consequently as an operating expense. *See generally* Southwestern Elec. Power Co. v. Federal Power Com'n, 304 F.2d 29, 41 (5th Cir., 1962). This conclusion helps explain why the FPC places so much emphasis for regulatory purposes on the accounting practices of a licensee. The belief is that by regulating accounting methods, as well as actual accounting entries, the FPC can indirectly exert its influence on state

**1218**

dicative of a state regulatory policy to treat plant acquisition adjustments as a proper element of a licensee's rate base. However, this desired inference is negated by a statement in the closing lines of the Alabama Commission's 1945 report: "This permission to make such changes to Account 505 is made with the express reservation that such treatment is for accounting purposes only and such treatment shall not be construed as decisive of or presumptive of the treatment to be accorded these charges in rate or other proceedings." [22] Included in this

regulatory bodies which have the final say in setting a licensee's retail rates. *Id.* n. 24 at 41.

22. Pertinent excerpts from this report and the accompanying order of the Alabama Public Service Commission, issued on August 9, 1945, read as follows:

REPORT OF THE COMMISSION

The petition in this cause was filed with the Commission on July 26, 1945 and a public hearing thereon was held by the Commission at its offices in Montgomery, Alabama on August 3rd, 1945.

The petition sets forth the Company's proposal to record petitioners reclassification of plant account as of January 1, 1937 as filed with the Commission November 26, 1940, to make certain accounting adjustments to such reclassification as filed and seeks an order of the Commission directing disposal of amounts to be recorded in Account 107 Plant Adjustments and amounts to be recorded in Account 100.5 Electric Plant Acquisition Adjustments, all pursuant to the requirements of the Uniform System of Accounts for Electric Utilities as prescribed by this Commission.

The petitioner filed with this Commission on November 26, 1940, petitioner's reclassification and original cost studies of electric account pursuant to Electric Plant Account Instruction 2–D of the Uniform System of Accounts. Such reclassification and original cost studies were concurrently filed with the Federal Power Commission. After a field investigation by representatives of the Federal Power Commission, the results of which were made available to this Commission, conferences were held in the offices of the Federal Power Commission in December 1944 and April 1945 between representatives of the petitioner and members of the staff of the Federal Power Commission (members of the staff of this Commission being present) who discussed the reclassification of the plant account of petitioner and the adjustments relating thereto proposed by the examiners of the Federal Power Commission. During the progress of this discussion, representatives of the Company discussed various phases of the problems involved in conferences with this Commission and members of its staff.

As a result of these discussions, petitioner has made identical proposals to the Federal Power Commission and this Commission relating to the recording of the Company's reclassification of plant account and the disposal of the amounts to be recorded in Account 107 Plant Adjustments and amounts to be recorded in Account 110.5 Electric Plant Acquisition Adjustments.

\* \* \* \* \*

At the hearing on August 3, 1945, the Company offered testimony and documentary evidence in support of its petition.

The Company maintained at the hearing that under the provisions of the System of Accounts prescribed by this Commission the proper income account for recording the monthly charges for the amortization of Account 100.5 is Account 505 "Amortization of Electric Plant Adjustments", an account which provides for operating revenue deductions. In support of its position, the Company presented evidence that the amounts reflected in Account 100.5 represented actual cash or cash equivalent paid in many arms-length transactions throughout the history of the Company for properties acquired as operating units or systems; that these acquisitions were made in the course of and as a necessary part of its program to provide an integrated electric system and that as a result of such acquisition and integration it has been able to replace small isolated systems throughout the State served by small and inefficient generating plants with a modern integrated electric system consisting of large centrally located hydro electric and steam generating plants, an interconnected system of transmission lines and distributing systems, all of the most modern type, to the great improvement of the quality of its service to its customers. The Company also presented detailed evidence as to expansion of the Company's service year by year and the decline in its rates for service of all

exhibit was a letter from the Alabama Public Service Commission dated August 20, 1951, directing the company "to continue to amortize amounts recorded in Account 100.5 by charges to Account 505, Amortization of Electric Plant Acquisition Adjustments." This ruling was based on the evidence adduced in the 1945 proceedings. Again, the 1951 ruling was not issued in a rate-determination proceeding and thus concerns only suitable accounting practice.[23] Nonetheless, certain language in this letter indicates that by 1951 the Alabama Commission was not as reluctant as it had been in 1945 to make a definite decision regarding the proper treatment— whether for accounting or rate making purposes—of the amortization of the acquisition adjustments account. This letter reads:

> classes. The Company also presented accounting opinion that under such circumstances it is proper to treat amounts devoted to amortization of Account 100.5 as operating expense.
>
> This Commission does not consider that it is necessary to decide in this proceeding the question whether current charges to revenue for amortization of amounts recorded in Account 100.5 should be considered for regulatory purposes as in the nature of an operating revenue deduction or as an income deduction. Inasmuch as the conditions or terms are not clearly prescribed under which income deductions Account 537 should be used instead of operating revenue deductions Account 505, and inasmuch as either of such accounts may by its terms be used to reflect the substance of the transaction as a segregation of revenue for the amortization or retirement of invested capital recorded in Account 100.5, our order will permit that monthly charges for such amortization may be recorded by the Company in Account 505 without now deciding whether such charges are under the facts of this case in the nature of operating revenue deductions or income deductions. This permission to make such charges to Account 505 is made with the express reservation that such treatment is for accounting purposes

Alabama Power Company
600 North 18th Street
Birmingham, Alabama

Gentlemen:

In the proceedings conducted in August 1945 and bearing Docket No. 9437, with respect to the reclassification of your accounts, this Commission considered the question whether the charges to amortize the amount recorded in Account 100.5, Electric Plant Acquisition Adjustments, should properly be treated as operating revenue deductions or its income deductions. We did not deem it necessary at that time to determine this question but permitted you to make such charges to Account 505, Amortization of Electric Plant Acquisition Adjustments, which is an operating revenue deduction account.

> only and such treatment shall not be construed as decisive of or presumptive of the treatment to be accorded these charges in rate or other proceedings.
>
> \*　　\*　　\*　　\*　　\*
>
> ORDER OF THE COMMISSION
> The premises considered, IT IS ORDERED BY THE COMMISSION:
>
> 1. That petitioner dispose of the balance of $9,886,575.06 to remain after adjustment in Account 107, Plant Adjustments, and may do so as set out in detail in the report accompanying this Order.
>
> 2. That petitioner dispose of the balance to remain after adjustment in Account 100.5, Electric Plant Acquisition Adjustments, in the amount of $8,777,898.84 and may do so by making monthly charges of $48,766.11 to Account 505 "Amortization of Electric Plant Acquisition Adjustments", subject to the reservation stated in the report accompanying this Order, with concurrent credits of the same amount to Account 100.5 commencing as of August 1, 1945 and continuing for fifteen (15) years. Provided, however, that such amortization may, at the election of the Company be accelerated from time to time upon approval of the Commission.
>
> \*　　\*　　\*　　\*　　\*

23.  *But see* note 21, *supra.*

You have now advised us that by reason of developments in the pending proceedings in connection with your proposed issue and sale of $15,000,000 First Mortgage Bonds, it has become important for this Commission to issue a ruling as to the proper accounting treatment of such amortization.

We have reviewed the evidence submitted by you in the proceeding bearing Docket No. 9437 in support of your position that charges to amortize the amounts recorded in Account 100.-5, Electric Plant Acquisition Adjustments, should be treated as operating revenue deductions. Such evidence is to the effect that the amounts recorded in Account 100.5 represent reasonable costs incurred in arms length transactions by which properties devoted to electric public utility service were acquired in the course of establishing or extending your integrated system with resultant better service and lower rates. We are of the opinion that costs of such a nature are costs incurred to provide electric utility service and that amortization of such costs should be accomplished by operating revenue deductions. We assume the accuracy of your evidence in such proceedings and you are therefore directed to continue to amortize amounts recorded in Account 100.5 by charges to Account 505, Amortization of Electric Plant Acquisition Adjustments.

Yours very truly,
ALABAMA PUBLIC SERVICE COMMISSION

In the instant case the FPC attached little or no probative value to this letter because of the statement in it by the Al-

abama Commission that: "We assume the accuracy of your evidence." The FPC considered this statement as implying that in issuing its 1951 ruling, the Alabama Commission had "not scrutinized in any way" the company's evidence.[24] In light of the Alabama Commission's statement in the letter that it reviewed the evidence presented in the 1945 proceedings, however, it is obvious that the Commission placed far too much emphasis on the statement concerning the accuracy of the company's evidence. This isolated sentence, divorced from the context in which it was made, does not support the FPC's total rejection of this evidence. When the 1951 letter is read as a whole, and considered with the 1945 order and opinion, it could support an inference that the Alabama Commission would treat plant acquisition adjustments as having place in a licensee's rate base.

Alabama Power also offered evidence that in a 1958 rate proceeding involving another company, the Alabama Commission held that acquisition adjustments were properly included in the rate base. This evidence was regarded as insignificant because the proceeding there did not concern Alabama Power's rates and also because the decision was not rendered during the period being treated in the instant allocation case.

Finally, in 1969 and 1971, the Alabama Commission handled rate cases involving Alabama Power and there allowed unamortized plant acquisition adjustments to be included in the company's rate base.[25] This latter evidence was tendered to the Commission in Alabama Power's petition for rehearing. The Commission considered it but con-

24. Paragraph 70 of Opinion No. 596 reveals the FPC's views concerning the probative value of the 1951 letter: "We also note that the licensee submitted as Exhibit 1 a letter from the Alabama Commission dated August 20, 1951, approving amortization of Account 100.5 by charges to Account 505 (above-the line) on the basis of licensee's evidence that amounts recorded in Account 100.5 resulted in bet-

ter service and lower rates. This evidence apparently was not scrutinized in any way by the Alabama Commission, because it stated in the same letter: 'We assume the accuracy of your evidence.'"

25. In re Alabama Power Co., 88 P.U.R. 3d 391 (Ala.P.S.C.1971); In re Alabama Power Co., 83 P.U.R.3d 321 (Ala.P.S.C. 1971).

cluded that it was irrelevant and decided against reopening the proceeding. This decision was apparently grounded on the remoteness in time of these rate cases to the period involved in this case.

Alabama Power asserts that the manner in which the Commission applied its new standard in this proceeding is arbitrary and, for practical purposes, renders it virtually impossible for it to prevail under the standard by offering sufficient proof of the Alabama Commission's rate policy during the period in question. Paragraph 70 of Opinion No. 596, together with the FPC's treatment of the petition for rehearing, exhibits an almost complete reliance by the Commission on the absence of a general rate case involving Alabama Power during the period involved in this allocation proceeding as the basis for holding that the company could not meet the standard. There is an absence of any other explanation for its holding. Moreover, there is no discussion of the reasons for the FPC's apparent requirement that in order to come within the new standard a licensee be involved in a rate case during the period concerned in a subsequent allocation determination. This requirement does not appear in the Commission's formulation of the standard.[26]

■■ Our function as a reviewing court is not to set up standards or rules for the FPC to follow in deciding whether unamortized acquisition adjustments should be included in this petitioner's investment base. Nor, once the Commission has established such a standard, is it our function to determine whether Alabama Power comes within the standard. *See* Southwestern Elec. Power Co. v. Federal Power Com'n, 304 F.2d 29, 42 (5th Cir., 1962), cert. den., 371 U.S. 924, 83 S.Ct. 292, 9 L.Ed.2d 232.

"It is certain that this Court may not retry the controversy, substitute its judgment for that of the Commission as to any doubtful or debatable questions of fact, or reverse the challenged orders because the Commission has re-

jected the views of the [Alabama Power Company] as to what inferences should be drawn from the evidence. The Commission 'is the agency which weighs the relevance of factual data.' See National Labor Relations Board v. Stowe Spinning Co., 333 U.S. 226, 231, 69 S.Ct. 541, 545 [93 L.Ed. 638]."

Iowa v. Federal Power Commission, 178 F.2d 421, 427 (8th Cir., 1949), cert. den., 339 U.S. 979, 70 S.Ct. 1024, 94 L. Ed. 1383. The inferences to be drawn from the evidence presented is peculiarly a matter for agency expertise, and thus we are not free, as Alabama Power suggests, to hold that the state's regulatory policy during the period in question was to include unamortized acquisition adjustments in a licensee's rate base. Our role in reviewing the Commission's application of its newly developed standard is, however, to make certain that there is a "rational basis for its conclusions and warrant in the record for its judgment." Southwestern Elec. Power Co. v. Federal Power Com'n, 304 F.2d at 43. "[A] reviewing court cannot perform its proper function when the regulatory body has failed to make adequate exposition of the grounds for its decision." South Carolina Generating Co. v. Federal Power Com'n, 249 F.2d 755, 764 (4th Cir., 1957), cert. den. 356 U.S. 912, 78 S. Ct. 668, 2 L.Ed.2d 585. *See* Atchison, P. & S. F. Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); Schaffer Transp. Co. v. United States, 355 U.S. 83, 91, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957); Scenic Hudson Preservation Conf. v. Federal Power Com'n, 354 F.2d 608 (2nd Cir., 1965); Rochester Gas & Elec. Corp. v. Federal Power Com'n, 344 F.2d 594 (2nd Cir., 1965), cert. den., 382 U.S. 832, 86 S.Ct. 72, 15 L.Ed.2d 75. *Compare* Scenic Hudson Preservation Conf. v. Federal Power Com'n, *supra, with* Scenic Hudson Preservation Conf. v. Federal Power Com'n, 453 F.2d 463 (2nd Cir., 1971) (after remand).

---

26. *See* Opinion No. 596, ¶ 70, quoted in text, *supra.*

We have concluded that the record in this case does not support the Commission's refusal to include the unamortized portion of the Electric Department's acquisition adjustments in its investment base for purposes of this allocation proceeding. Whether the Commission allows Alabama Power to adduce additional evidence in support of its position, or elects merely to amplify its reason for rejecting the evidence presently in the record and that offered in the company's petition for rehearing, is a matter for agency determination. We remand this part of the case for further proceedings consistent with this opinion.

### III.

The remaining two issues concern contributions in aid of construction and construction work in progress. Considering the decision we have reached regarding the meaning of actual, legitimate investment, it is necessary that we set aside the Commission's order as it relates to these two issues and remand them to the FPC for reconsideration in light of this opinion. We do not hold, as we did on the depreciation issue, that the Commission erroneously excluded contributions in aid of construction and construction work in progress from the investment base of either the Electric Department or the project. Rather, because the approach of the Commission in reaching its conclusions on these issues was fundamentally the same as that it used in deciding the depreciation issue, it seems appropriate that the Commission should be allowed to reassess its decisions in these two areas against the backdrop of our decision. *See generally* United States v. Moretti, 478 F.2d 418 (5th Cir., 1973).

Those portions of Order No. 596 with which we were concerned on this petition for review are set aside and this case is remanded for further agency action not inconsistent with this opinion.